CARLSON v. UNITED NEW YORK SANDY HOOK PILOTS' ASS'N et al.

(District Court, S. D. New York. April 7, 1899.)

MASTER AND SERVANT—FELLOW SERVANTS—NEGLIGENT KILLING OF SEAMAN.
   A steam pilot boat approached an outgoing steamship for the purpose. of taking off her pilot, which was to be done by holding the pilot boat as near as safe and practicable to the steamer while a small boat was lowered and rowed to the steamer, returning with the pilot. Held, that a mate of the pilot boat, who had charge of her navigation, was a fellow servant of the men lowering the small boat and the seamen therein, each being at the time engaged in executing a part of a common undertaking in which each took the risk of the others' negligence, and that the owners could not be held liable for the death of the seamen in the small boat, though caused by the negligent navigation of the pilot boat by the mate after the smaller boat had been lowered alongside.

In Admiralty. Death claim. Pilot boat.

Wheeler & Cortis, for libelant.

J. Culbert Palmer and Harrington Putnam, for respondents.

BROWN, District Judge. The above libel was filed by the administrator of Theodore Carlson, a seaman on the steam pilot boat New York, whose death is alleged to have been caused by the negligence of the mate of the New York in reversing the propeller, in consequence of which the yawl, in which the seaman had just launched, was caught and the two seamen in her killed. The accident occurred at about 10:30 p. m. of November 12, 1897, outside of Sandy Hook, and a little to the eastward of the easterly end of Gedney Channel.

The steam pilot boat New York was 177 feet long, and built expressly for the pilotage service. She was owned by the United New York Sandy Hook Pilots' Association and. the United New Jersey Sandy Hook Pilots' Association, which were corporations organized under the state acts of New York and New Jersey, upon the reorganization of the pilotage service in 1895, for the purpose of taking the title to all the pilot boats used in the service; and the New York was built .by those corporations afterwards for the same service. These corporations exercised no control over the management or

running of the pilot boats, or of the New York. The boats were turned over for use and management to the pilots, who were shareholders in the corporations, and who formed incorporated pilots' associations, the presidents of which are co-defendants in the above libel.

At the time of this accident the New York was stationed, as usual, near the easterly end of Gedney Channel for the purpose of supplying pilots to such incoming vessels as had been missed further outside, and also for the purpose of taking off pilots from outward bound vessels. Receiving a signal from the outward bound steamer Massachusetts that a pilot was to be discharged, the New York, which was then somewhat to the northward of the outlet of Gedney Channel and heading northeast, was turned around through the westward and southward, under a starboard wheel, until she came nearly astern of the Massachusetts and followed her up until she was about 150 feet distant from her and on her starboard side, whereupon the starboard yawl was ordered to be launched and manned by two men, Carlson and Ayres, who were to row to the Massachusetts and receive the pilot. After the two men had got aboard, the port yawl was lowered by means of a falls and a hook which hooked into a sling holding the yawl, by which it was speedily lowered into the water on the port side of the New York. At that time, according to the testimony, the New York was moving ahead very slowly, the engine being stopped; and about a minute, as was supposed, after the yawl had been unhooked, the propeller was reversed and about 30 revolutions made backward in order to avoid too near an approach to the Massachusetts in the strong westerly wind. A few moments afterwards it was noticed that the yawl could not be seen approaching the steamer even by the use of the search light, and on examination a broken oar and some pieces of wreckage were found a little astern of the New York, and the next day the bodies of the two men were found mutilated upon the shore. These circumstances leave no reasonable doubt that the men lost their lives from the fact that the yawl in some way was struck by the propeller blades while reversing; why or how the yawl came to be there or what neglect or inaction, if any, of the men on board contributed to this result, is wholly unexplained, and is left to mere surmise.

The evidence shows that it was customary after the yawl was unhooked and "was in position to take care of itself" for a signal "all right," or "all gone," or "all free," to be given to the man in the pilot house to indicate that the yawl was clear, and that the steamer could be navigated in any way desired. The mate testifies that he received the usual signal on this occasion, and that he waited about a minute before reversing. The witness Christensen, one of the sailors who assisted in lowering the yawl, testified that the usual hail "all right" or "all gone" was not given. Waldie, the boat keeper, and who operated the winch in lowering away, says: "I told the mate the yawl was gone and we had used the port yawl." Heath, who was one of the pilots on board watching for outward bound vessels, and who was in the pilot house at the time of the accident, says Mr. Waldie came forward and said: "All right, we have used the port yawl." Christensen also states that Waldie made the report

that the port yawl had been used instead of the starboard yawl, as first ordered. I am not warranted on this evidence in rejecting the statements of the three witnesses that the words "all right" or "all gone" were used in the report to the mate in the pilot house, in accordance with the usual custom, from which he would rightly understand that he was free to navigate the steamer as desired.

It is urged that these three witnesses have an interest in the result which should deprive their testimony of credit. The only testimony opposed, however, is that of Christensen, and upon the single point only that he did not hear the signal given "all right" or "all gone." But inasmuch as he says that a report was made by Waldie in regard to the use of the port yawl, it is hardly natural to suppose that this report would be made at a different time, or separately, or unaccompanied by the usual signal as to the clearing of the yawl. It was not of such importance as to lead naturally to a separate report. The evidence of several other witnesses, moreover, so far inculpates Christensen that he can scarcely be said to be a less interested witness, though in a different way. Christensen held the stern painter of the yawl at the time it was lowered. Three witnesses testify that it was the custom and the special duty of the person holding the stern painter, to hold on to it after the yawl was launched and to move forward so as to slew the bow of the yawl outwards and away from the steamer in order to let the oarsmen pull off at once. The mate testifies that this was very essential. On this occasion Christensen says that he threw the stern painter into the yawl as soon as she was launched, and before the bow painter had been cast aboard. This neglect by Christensen of the customary duty to aid in slewing the bow out at once so that the men could pull away, was undoubtedly one of the causes of the accident. The wind being strong from nearly astern, but a little on the port quarter, would naturally delay the yawl's heading outwards, both by blowing the bow towards the steamer's side, as well as blowing the yawl forward alongside the steamer, so that the steamer, moving slowly forward, would draw ahead of the yawl more slowly than usual. Christensen says that he saw the men sitting down in the boat after unhooking, but did not see them push off, or have the oars in their hands, or endeavor to push off; that was a few feet aft of the launching place and it was the last that was seen of them. This would indicate that the men counted on drifting astern, past the propeller, before attempting to row, and that they made no endeavor to get away from the side of the New York as they were expected to do.

Upon the testimony of Heath and Waldie, and of Ashcraft, the mate, I do not see how it can be said that negligence on the part of the latter is established. Upon the notice or hail testified to have been given to and received by the mate, he was justified in supposing that the yawl was entirely clear and in acting upon that report. The negligence, so far as respects those on board the steamer, must be divided between Christensen, who neglected to pull the stern forward and swing the bow off so that the men in the yawl could pull away, and Waldie, in making the report that the yawl was gone without seeing or making sure that the yawl had pulled away. Both of

these men were without doubt fellow servants of Carlson, and their negligence would not sustain this action.

Even if the mate could not be deemed justified in acting upon the report made to him, and in reversing as soon as he did, my own view is that the mate's act would also be that of a fellow servant engaged in the same common employment. The employment of all at that moment was to get the pilot from the Massachusetts to the New York. The yawl was to receive the pilot from alongside, and it was the business of the mate in the pilot house to keep the New York in a proper position to do this work conveniently and safely, without injury to the yawl, the New York or the Massachusetts. The pilot's act in reversing had immediate reference to that purpose and no other. He was not the master of the vessel, nor was his act done in the exercise of any command or authority over subordinates; nor did he neglect to take proper measures for security when attention was called to a menacing danger, as in The Frank and Willie, 45 Fed. 494, nor was his act in performance of any duty resting on the owner; nor was it done while he was acting as a special representative of the owner; but it was merely one of the details of navigation while in the execution of a particular service in a common employment with the men in the yawl, in which each took the risk of the others' neglect. Steamship Co. v. Merchant, 133 U. S. 375, 378, 379, 10 Sup. Ct. 397; Railroad Co. v. Hambly, 154 U. S. 349, 14 Sup. Ct. 983; Same v. Charless, 162 U. S. 359, 16 Sup. Ct. 848; Same v. Peterson, 162 U. S. 346, 16 Sup. Ct. 843; The City of Alexandria, 17 Fed. 390, 392; The Queen, 40 Fed. 694; The Job T. Wilson, 84 Fed. 204, 207; The Miami, 87 Fed. 757, 759, 760, affirmed in 93 Fed. 218.

As the maritime law gives no action for death caused by negligence on the high seas (The Harrisburg, 119 U. S. 199, 7 Sup. Ct. 140), this action can rest only upon the state statute; and to make that applicable the negligence, or the death, or both, must happen within the jurisdiction of the state. The location of the accident according to the weight of evidence, seems to me clearly more than a marine league, or three miles, from any part of the shores of the state of New York or New Jersey; nor is there any manner of drawing lines from headland to headland, except as below stated, by which this location could be brought intra fauces terræ. Under the act of congress, however, approved February 19, 1895 (28 Stat. 672), having reference to the regulations for preventing collisions at sea and authorizing the secretary of the treasury "to designate and define the lands dividing the high seas from rivers, harbors, and inland waters," the secretary drew a line extending from Navesink light house N. E. ⅝ E. about 4½ miles to the Scotland light vessel, which is 3 miles from the nearest shore on Sandy Hook, and thence N. N. E. ½ E. through the Gedney Channel whistling buoy to Rockaway Point Life Saving Station on the Long Island shore. The accident occurred undoubtedly to the westward of that line. Even if this line was a couple of miles beyond the usually recognized limit of three miles from shore, it is contended that the line thus established by the secretary of the treasury would be valid as an assertion of the exclusive jurisdiction

of the United States as against other nations, because this extension seaward is undoubtedly less than the range of our modern shore batteries (see Pom. Int. Law, §§ 144, 150; Wheat. Int. Law, 177) and any such extension by the United States, it is urged, extends pari passu the jurisdiction and boundaries of the state as its necessary incident. In the case of Bigelow v. Nickerson, 17 C. C. A. 1, 70 Fed. 113, however, to which reference on this point is made, the question had reference to the state jurisdiction over the waters of Lake Michigan and was quite different from the present; since there the acts establishing the boundaries of the state expressly included the waters of the lake. In that case, moreover, it was assumed that upon the ocean the state jurisdiction extends but a marine league from shore. See, also, Manchester v. Massachusetts, 139 U. S. 240, 11 Sup. Ct. 559. But I doubt whether in fixing the line as above indicated, the secretary of the treasury intended to pass beyond the limit of a marine league, the usually accepted boundary. The Scotland light ship does not exceed that distance from shore, and if from that vessel a line be drawn to a point one marine league south of the western end of Rockaway Beach, that line will pass through the whistling buoy; so that the secretary's line seems to agree accurately with the old rule of jurisdiction, and the accident would be found to be within the state limits.

Upon the view above expressed, however, on the question of negligence, it is unnecessary to consider further the defense that the tort in question was beyond the jurisdiction of the state law; or to consider whether the establishment of an exterior boundary line for the application of the international rules of navigation as distinguished from the rules for harbors and inland waters, would operate as an assertion by the United States of its exclusive jurisdiction beyond a marine league; or whether, if that line were so intended, its extension seaward, based upon the greater range of the United States shore batteries, would ipso facto extend the scope of the state laws over the high seas.

The libel must be dismissed, but without costs.