RED RIVER LINE v. SMITH et al.

(Circuit Court of Appeals, Fifth Circuit. February 13, 1900.)

No. 832.

1. MASTER AND SERVANT—STEAMBOATS—NEGLIGENCE.

The fact that the work of unloading cotton from a barge onto a steamboat engaged in the river trade on the Mississippi was carried on after dark, and while the boat was moving down the river, and that the mate was hurrying up the work, does not show negligence on the part of the owners of the steamboat, since it is the common practice and duty of the masters and crews of boats engaged in the river trade to push their employment, and, when called for, to receive, deliver, and stow freight at night as well as in the daytime.

2. SAME—ASSUMPTION OF RISKS.

The risks attendant on service on a steamboat engaged in the river trade on the Mississippi, being well known to the people employed, are assumed by the crew.

3. SAME—FAILURE OF ELECTRIC LIGHTS.

The owner of a steamboat engaged in the river trade on the Mississippi is not liable for the death of a servant who fell overboard while unloading cotton at night from a barge onto the steamboat, because of the failure of the electric lights, which was not shown to have been the fault of the owners or the master, but was an incident common to the employment of such lights, where the lard-oil hand lanterns furnished as a substitute were the best that could be obtained, and formerly were considered fully sufficient for the purpose.

4. SAME—FAILURE TO FURNISH STAGING.

Where the use of staging or connecting planks in transferring cotton from a barge to a steamboat was neither customary nor practical, the failure to furnish such staging was not negligence.

Appeal from the District Court of the United States for the Eastern District of Louisiana.

This is an action in personam brought by Johanna Smith, widow, and J. H. Smith, half-brother, of John Smith, deceased, against the Red River Line, a Louisiana corporation, owner of the steamboat Electra, for subtraction of wages, and to recover damages for the death of the said John Smith, who lost his life on the night of the 12th of December, 1897, by falling overboard from the steamboat Electra and drowning. During the month of December, 1897, the Electra was employed in the Red river trade, carrying freight and passengers to and from the port of New Orleans. John Smith was shipped and employed on board the Electra as a roustabout, at the wages of $13 per week. The third article of the libel charges: "That on the said 12th day of December, 1897, while the said steamboat was so descending Red river, three miles this side of Black river, and was on her way to the port of New Orleans, on her said voyage, she was receiving cotton from a barge which was brought alongside of her, and the said cotton was being unloaded from the said barge onto the said steamboat Electra while said steamboat proceeded on her said voyage, and without stopping. The transfer of said cotton from the said barge onto the said steamboat was so being made by the said John Smith and other members of the crew of the said steamboat under the direction of the said mate of the said steamboat, who was driving the said crew and the said John Smith, and compelling them and the said John Smith to work with great haste in rolling with their hands the bales of cotton from said barge onto the said steamboat. That the night was dark, and it was difficult to see sufficiently to prevent falling into the river between the said barge and the said steamboat. That the lighting apparatus of the said steamboat had just previously broken down, and was not in working condition, and no lights were supplied where said transfer of said cotton from said barges to said steamboat was being made,

until the said John Smith fell overboard and was drowned. That when said steamboat, with the said barge alongside of her, reached a point on Red river, on the said night of the 12th of December, 1897, about three miles below Black river, and while the said mate was so directing the crew of the said steamboat and the said John Smith in the loading of the said cotton upon the said steamboat from the said barge, and while the said mate was driving the said crew and the said John Smith, and compelling them and the said John Smith to work with great haste, and the said steamboat was running at her usual rate of speed, she swung around the bend of the river, and, as she did so the barge swung out from the steamboat; and at that moment the said John Smith turned the bale of cotton which he was rolling, so as to place it upon the steamboat from the said barge, and, owing to the darkness of the night and the want of light, he, the said John Smith, endeavoring to step from the barge onto said boat, as he and the rest of the crew had been doing, and not being able to see the space which then existed between the said barge and the said steamboat, fell overboard into the river and was drowned; the said mate of the said steamboat being at the time in charge of and directing the said unloading from said barge, and the loading upon said steamboat, of said cotton, and was so driving the said crew and the said John Smith, and requiring them to work with great haste and without light." The fourth article of the libel is much to the same import, but charges that the barge was not sufficiently and securely lashed; no connecting planks or other guards were supplied to prevent the space between the barge and the steamboat while the transfer of cotton was being made; that the mate and officers were reckless in urging haste in the work; and that the steamboat was in fault for not providing sufficient lights. The fifth article of the libel charges the officers of the steamboat with neglecting to use proper efforts to rescue and save the life of said John Smith. And the sixth article charges that after Smith fell in the river he called for assistance, and was not drowned for some time thereafter, during which period of time he suffered agony of mind, fear, and torture, and finally sank, with a full consciousness of the fate to which he was doomed; and further charges the officers of the steamboat with not making adequate efforts to rescue the said John Smith, and alleges that the Red River Line is liable for the suffering of said Smith prior to his death, as well as for his loss of life, and further liable for balance of wages due him, but no amount is averred. The answer admits the employment of the said Smith on the Electra, and the time and location of the accident, but avers that the barges were securely, safely, and closely fastened to the steamboat. It admits that the loading was done by the crew, including the said Smith, under the direction of the proper officer of the steamboat, both at the various landings and while running, during the night of the said 12th of December, 1897. It avers that competent and sufficient lights, ample in number, were had and used upon the steamboat during the said night, and avers that during the day and night the said Smith had been engaged in making the transfer of cotton from the barges to the steamboat, and had become acquainted with the location, and the duties incumbent upon him, and the risks which he was running, and that the steamboat and its officers were not at fault. The answer also avers that no fault existed on the part of the steamboat in its equipment, apparatus, or management; that it is impossible and unknown on vessels lashed together to keep connecting planks or guards between the two; that no haste was ordered, required, or had, and the duties performed by said Smith at the time he lost his life were those which were usual, proper, and customary, etc. The answer further denies that the steamboat at the time of the accident was running at the regular rate of speed, and avers that she was running under a very low rate of speed; that the engines had been slowed down before reaching the point at which the accident occurred, and at the time of its occurrence the steamboat was simply floating with the current. And the answer avers that when the said Smith fell into the river the yawl of the steamboat was immediately lowered, and proper search made for the man, but without avail, and "that immediately thereafter the said steamboat was tied to the bank of the river, to await the rising of the moon, to make further search and examination, and to further navigate the said river without accident or detriment to the said steamboat, its barges or crew. And the answer avers that the wages due to the

said Smith at the time of the accident amounted to only $10, which it is averred was tendered to libelants, and is put in deposit as a tender in this suit." On hearing, the district court decreed that "the libelants, Johanna Smith, widow of John Smith, deceased, and J. H. Smith, do have and recover of and from the Red River Line, respondent, the sum of three thousand dollars, and all costs of suit." After vainly endeavoring to obtain a new trial, the respondent sued out this appeal.

W. S. Benedict, for appellant.

J. Ward Gurley, for appellees.

Before PARDEE and SHELBY, Circuit Judges.

PARDEE, Circuit Judge (after stating the facts as above). It is assigned as error that neither under the law of Louisiana nor in admiralty is there any survivorship to, or right of action in, the libelants, or either of them, under the circumstances set forth in the libel and proofs. There is a very grave doubt whether the libelant J. H. Smith, brother of the deceased, John Smith, can maintain an action for damages for the unlawful death of the said John Smith. The libel pretends to be for the recovery of wages due the said John Smith, and for certain damages accruing to the said John Smith personally, by reason of his sufferings while drowning; and it is contended that, as these damages accrue to the estate of John Smith, his heirs can maintain an action. So far as the action is for wages, the sum due was tendered in court, but no specific action was taken in relation thereto. The decree rendered below does not show that any part thereof was for wages due the said John Smith, or for damages due his estate. The right of the libelants, as heirs, to recover either wages or debts due the estate of John Smith, would have been adversely settled upon an exception. However, the objection now assigned was not made in the court below, and, from the view we take of the case on the merits, it is unnecessary to pass upon the said assignment, and we decide nothing in regard thereto.

The evidence submitted on the hearing establishes that John Smith, deceased, was regularly shipped and employed as a roustabout on the stern-wheel steamboat Electra, then navigating the Mississippi river and tributaries; and at 7 o'clock p. m. of the 12th of December, 1897, when the Electra, with a barge load of cotton in tow, was descending the Red river, the said John Smith lost his life by falling overboard and drowning. The night was dark. It was known that there were many and dangerous bends in the river. The electric lights with which the steamboat was provided were broken down and could not be used, and in lieu thereof, and to furnish light for the transfer of the cotton from the barge to the boat, lard-oil hand lanterns were supplied and used, which, while inferior to, and a poor substitute for, the electric lights, were the best lights that could be furnished under the circumstances, and the same kind of lights as were used on all steamboats carrying cotton prior to the introduction of electric lights. In fact, the use of coal oil was prohibited to boats carrying cotton, by the underwriters. On account of the low state of water in the river, the

method of bringing the cotton out of Red river was to load the same on barges, which were towed by the steamboat to deeper water, and then the cotton was transferred from the barge, and regularly loaded on the boat. On this occasion the steamboat had two barges in tow, one on each side, each nearly as long as the steamboat. They were as closely and securely lashed to the steamboat as the nature of the case permitted,—with head line, breast line, stern line, and tow line. Although as securely lashed as the case would permit, on account of the stretching of lines whenever the boat entered the bend or rounded the same, the barges would swing out, first at the bow, and afterwards at the stern, the distance of 18 inches to 2 feet. At the time in question the steamboat was rounding a bend, but she was under no headway,—merely keeping straight in the stream and floating. In transferring cotton from the barge to the boat, no stage planks were used. Although the business carried on as above is of long standing, there is no proof in the record of any custom to use stage planks on such occasions. What proof there is is to the contrary of such usage, and the reasons given for not using stage planks appear to be satisfactory. The customary method of unloading cotton from barges was, as shown by the evidence of the master of the Electra, as follows:

"Q. Did you have, or is it customary to have, in unloading from barges onto the boat, staging between the two? A. No, sir. Q. Why? A. Because it is always one or the other: The cotton on the barge will be higher than the cotton on the boat, or the boat's cotton will be higher than the cotton on the barge. Therefore we can't use them. Q. What is the method pursued in taking the cotton from the barge onto the boat? A. We roll it as long as— Dump it off onto the boat as long as we can. Or, if it is on a level, we roll it from the barge to the boat; and, after it gets too low below the boat to roll or dump it on there, why, we ship it with the capstan. Q. Have you any employés at the same time on board the boat, and for what purpose, in connection with the cotton, at the same time that men are rolling the cotton off the barge to the boat? A. Yes, sir; we have from four to six men stowing the cotton. Q. How long have you been steamboating? A. I have been steamboating ever since I was 13 years old, and I am 44 years old."

And this evidence is not contradicted.

John Smith fell overboard and was drowned while cotton was being transferred from the barge to the steamboat, but exactly how he fell overboard is uncertain. The libel charges that he was rolling cotton from the barge to the steamboat, and, owing to the darkness,—want of light,—he, the said John Smith, in endeavoring to step from said barge onto said boat, as he and the rest of the crew had been doing, and not being able to see the space which then existed between the said barge and the said steamboat, fell overboard into the river and was drowned. Edward Ross, roustabout, for the libelants, testifies that, "In jumping down from the barge to the boat, Smith did not jump far enough, and went into the river." Jeff Henry Smith, one of the libelants in this case, says that "the barge swung out from the boat as John Smith was rolling a bale of cotton from the barge to the boat; and, by way of being rushed, and no light at all, he goes in this hole between the boat and the barge." Charlie Hughes, roustabout, for libelants, says that "the barge swung out, and Smith tumbled and went

overboard." Heywood Stephens, another witness for libelants, says that "the night was dark. The mate was rushing them, and Smith could not see. He stepped backwards overboard." James W. Doubleau, porter of boat, for libelants, says that "the barge swung out, and, in stepping from one bale to another, John Smith missed the bale, and went in between the barge and the boat, and fell into the river." George Hawkins, roustabout, for the respondent, says that "Smith was careless,—stepping and not looking,—and fell in between the barge and the boat." George McCutcheon, roustabout, for respondent, says: "John Smith rolled a bale of cotton off the barge to me, and I put my hook in the bale,—took it away from him; and, as he turned it loose, he turned around, turned away from me, and then stepped down between the boat and the barge. He was actually crossing over from the barge onto the boat. He had one foot on the barge and one foot on the boat, and when he fell he was returning to the barge." When Smith fell in the river, it appears, he went with the current, ahead of the boat. As soon as the alarm was given, which was immediate, his cries being heard ahead of the boat, attempts were made to throw him a head line; and as soon as it could be done, under the circumstances, a yawl was lowered, and search made for him, but without avail. It is not disputed that the steamboat Electra, when she started on the voyage in question, was staunch and strong, fully manned and equipped, and fully supplied with all the appliances required by law, or usual to boats engaged in her trade. The negligence assigned as resulting in the death of John Smith is that the work of unloading the barge was carried on after dark, and while the boat was moving down the river; that the lights furnished were insufficient; that the mate was hurrying up the work; and that no stage planks were used between the barge and the boat. It is not only the common practice, but it is the duty, of the masters and crews of boats engaged in the river trade, to push their employment, and, when called for, to receive, deliver, and stow freight at night as well as in the daytime. The risks attendant upon such service are well known to the people employed, and are assumed by all hands composing the crew. The failure of the electric lights is not shown to have been the fault of the owners, or even of the master, but was an incident common to the employment of such lights. The lights furnished as a substitute were the best that could be obtained,—formerly were considered as fully sufficient for the purpose; and we think no negligence, particularly on the part of the owners, can be deduced from using them. We have already shown that the use of staging in transferring cotton from barge to boat is neither customary nor practical. Under the circumstances, we are unable to hold that the owners of the Electra were guilty of any fault resulting in the death of John Smith. No negligence on their part for which they were responsible is shown, but the case does show that all the matters complained of were customary perils of navigation, which John Smith necessarily assumed when he shipped on the steamboat. Howes v. The Red Chief, 15 La. Ann. 321, is not applicable here. That suit was to recover the value of a hired slave,

and was ruled on the law of bailment, instead of on maritime law. The decree of the district court is reversed, and the cause is remanded, with instructions to dismiss the libel.