## THE TROY.

### (District Court, W. D. New York.   June 25, 1902.)

**1. Seamen—Personal Injuries—Liability of Ship.**

Libelant, a deck hand on a lake steamship, while paying out the bowline to make fast to a dock, had his leg caught in a kink of the hawser and crushed off by being drawn to the bitts before he could be rescued.   He was acquainted with the work and with the surroundings, and another man was assigned to the work with him, which was shown to be the usual number on vessels having a steam windlass, as this one had.   The evidence failed to sustain libelant's allegations as to insufficiency in the equipment of the vessel, the unsuitableness of the place where he was working, or any shortage of hands, and no negligence on the part of the owners or master appeared.   *Held*, that on such facts the ship was not liable for the injury, whether it occurred from a risk incident to libelant's employment, and which was therefore assumed by him, or through the negligence of a fellow servant.

**2. Same—Injury in Service—Right to Cure at Expense of Ship.**

A seaman who is injured while in the service of the ship without fault on his part is entitled to be cured, so far as that is possible, at the expense of the ship; and in a suit by him in a court of admiralty to recover damages for the injury, in which it is determined that the ship is not liable, it is competent for the court, under a prayer for general relief, to award him compensation for the failure of the ship to furnish him proper support, medical attendance, nursing, and care while his wounds were healing, and for the additional suffering he endured for lack of such attendance and care.

In Admiralty.   Action by seaman to recover damages for personal injury.

Alfred C. Scheu, Donald Bain, and Charles A. Dolson, for libelant.
George Clinton and Maurice C. Spratt, for respondent.

HAZEL, District Judge.   This is a libel against the steamship Troy to recover damages for injuries sustained by libelant, an ordinary seaman, while in the employ of the libeled vessel on July 13, 1900.   The vessel was then at Duluth, Minn.   This was not the first trip of libelant on the steamer Troy as deck hand.   He shipped in that capacity for one trip during the season of 1898.   He was well acquainted with the manner of handling lines on board of lake propellers.   He handled the bowlines of the Troy several times on the day preceding the injury, and was well acquainted with the surroundings in that part of the ship where the bowline was used.   At the time of the accident he was in the performance of his duties, under the immediate orders of the mate. He was engaged in paying out a coil of rope to moor the vessel to the dock.   While performing that duty he suffered a most unfortunate accident: he lost his leg in a most shocking manner.   Libelant and another seaman, named Moxie, who was not produced as a witness by either party, had charge of the bowline in the forecastle.   Suddenly libelant was caught in a bight or kink of the hawser handled by him, and by force of the line moving through the chock was violently drawn to the bitts.   He cried out in alarm.   The captain rapidly directed the use of an ax, but before assistance availed the swiftly moving line had crushed and torn off his leg above the knee.   It is claimed for libelant that he is entitled to damages for the following reasons:   First, in-

sufficient number of men to navigate the vessel; second, defective condition of the rope, known to the owners; third, approaching dock at too great rate of speed; fourth, improper and unsafe place to pay out the line. The proofs disclose that the Troy, commanded by Capt. Gillies, and a crew of 24 men, left the port of Buffalo for the port of Duluth on the 7th day of July, 1900. An extra cook and waiter were engaged on account of passengers on board. The complement of men who were charged with the navigation of the ship consisted of the captain, two mates, two wheelsmen, four deck hands, two engineers, two firemen, two oilers, besides two cooks and a porter. The Troy is a large modern steel vessel of 5,400 tons, 402½ feet in length, 45½ feet beam, and 28 feet deep. She uses a modern steam windlass, and in making fast employs both bow and stern line. She shifted from one dock to another on the first day of her arrival at Duluth. Libelant handled the bowline. On July 13, 1900, at noon, she moved from the Union Pacific dock to slip 1, and then to slip 2, near by. To make the required maneuver she reversed at half speed under a proper helm for a distance sufficient to make a turn, and checked down preparatory to moving slowly under starboard wheel toward the dock. She used no excessive speed in approaching the dock. On account of the undertow the vessel was carried a short distance from her course, and to avoid colliding with docks and craft moored in slip 2 it became necessary to cast out a bowline to make her fast. The mate stood on the forecastle deck and gave directions through a speaking tube to the men in the forecastle below as to the manner of paying out the line. The preponderance of the evidence shows the speaking tube to have been in good condition. It extended from and through the forecastle deck down to within a few feet of where libelant was at work. Libelant testifies that at the time of the injury he alone handled the hawser, as the seaman who was detailed to aid him was inexperienced and of no assistance. The main theory upon which libelant rests is that the crew employed by the Troy was insufficient, and that to perform the work of paying out the line safely three seamen should have been assigned to that duty, one to pay out the line, another to straighten it, and the third to receive and interpret the directions of the officer in charge. The libelant testifies that the speaking tube failed to carry the sound of the mate's voice, and it was therefore necessary that his fellow deck hand should listen for orders at the porthole. This, libelant claims, rendered the complement of men assigned to this hawser short-handed; the work being of unusual danger and hazard on account of the kinks and tangles in the line. The rope was uncoiled on the deck, and had become somewhat stiff and hard. The mate testified that on account of the vessel shifting as she did from dock to dock there was not enough intervening time to straighten out the line prior to the accident. This appears to be a reasonable explanation of its uncoiled and tangled condition. The testimony of respondent establishes that, in vessels fitted with a steam windlass such as was used by the Troy, two deck hands are customarily required in the exercise of proper care to manipulate the line used to make the vessel fast. The libelant states on this point that it always took two men to handle the rope, besides a man to pass the orders; sometimes

the watchmen gave a helping hand, sometimes others; that the deck hand Moxie assigned to help him did not help at all. He listened with head out of the porthole for orders of the mate, who stood on the forecastle deck. Witness Andrews testifies that "two men could handle the line nicely,—two men in addition to a man taking orders at the porthole; three men handle it pretty nicely." Witness Miller, for libelant, says in using a five or six inch line three men are required to handle the forward line on such a ship as the Troy,—one to slacken off and make turns at the timberhead, another to take out kinks so as to keep the line clear, and a third to repeat the directions of the officer in charge. The evidence on the part of the respondent, however, fairly preponderates, and is to the effect that two deck hands are sufficient to handle the forward lines of the Troy, and that never more than that number was assigned for that purpose. Expert navigators testified that it is customary for lake vessels having no steam windlass to use three deck hands to handle lines, but where a steam winch is employed no such necessity apparently exists. Counsel for libelant with great zeal and earnestness contend that the crew was insufficient to properly navigate the ship, and that the proximate cause of the accident was failure to comply with section 4463, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3045] by which it is provided that "no steamer carrying passengers shall depart from any port unless she shall have in her service a full complement of licensed officers and full crew sufficient at all times to manage the vessel, including the proper number of watchmen." It appears from the certificate of inspection of the local inspectors of steam vessels that the Troy was required to carry a crew of 22. The certificate states as follows: She "is required to carry a full complement of officers and crew, consisting of 1 master, 2 pilots, mates, 2 engineers, 2 watchmen and 22 crew." It is insisted that the literal requirement of the certificate is that the Troy should carry a crew of 22 in addition to those specifically mentioned. The evidence of the local inspector, however, shows that the certificate of inspection issued on August 3, 1899, was erroneous. The true import of the certificate requires a crew of 22, including the master, pilots, engineers, and workmen. The witness Pope testifies that the numerals "22" on the certificate is a mistake, and that it should have been "15." It is further insisted that inasmuch as the certificate of the local inspectors required that the ship should carry 37 life preservers, and, as she was permitted to carry 12 passengers, it is clearly established that the ship was short in the number of her crew. This contention, however, seems to be fully explained by the local inspector Pope, who testified that at the time of the inspection she carried more life preservers than was necessary. She carried more than was required for the crew and passengers. The provision of the statute is complied with when a steam vessel carrying passengers shall be provided with life preservers sufficient for passengers and crew. Therefore the number of life preservers carried by her can be given no weight in considering the question of sufficiency of crew. The number in the certificate shows the actual number found on inspection, and not the minimum required. I think the evidence justifies the finding that the crew was in all respects sufficient to manage the vessel. Assuming

the accuracy of libelant's claim in that regard, it is not clear that any alleged insufficiency of crew was the proximate cause of the accident. The rope, though uncoiled and tangled, was not defective in a legal sense. It was stanch and strong, and fully answered the requirement.

That the libelant, by his acceptance of employment, assumed the ordinary risks attendant on the employment, does not need a citation of authorities. No claim is here made that the owner of the ship failed to use reasonable care toward the selection and retention of competent men to navigate the Troy. The ship, therefore, must be held free from fault if the injury occurred because of the negligence of a fellow servant. It is presumed that the owners of the vessel used due diligence in the employment of its officers and crew. The burden of proof of incompetency of officers or crew, therefore, is upon libelant to satisfy the court that the owners of the vessel failed in that regard. Soderman v. Kemp, 145 N. Y. 427, 40 N. E. 212; Railroad Co. v. Daniels, 152 U. S. 684, 14 Sup. Ct. 756, 38 L. Ed. 597; The Lydia M. Deering (D. C.) 97 Fed. 971. The proofs as a whole satisfy me that the vessel was properly equipped, and, as already stated, sufficiently manned. The crew was ample to insure that the work necessary to be done by libelant could be safely performed. The case is a sad one, and any existing equities should be resolved in favor of the libelant. It does not appear that the accident could have been prevented except by a more careful performance on his part of the duties imposed on the deck hand assigned to assist libelant. It is not entirely clear that the accident occurred through any act of a fellow servant. Doubtless the omission of Moxie to handle the line contributed to it.

It is contended that the failure of the mate to direct the line to be untwisted and coiled before using it, or that the failure of the watchman to properly perform his duties, may have produced it. If the accident may be ascribed to the negligence of either one of these men, it nevertheless was the negligence of a fellow servant. Under such circumstances there was no negligence which could be charged against the vessel, and render her owners liable or responsible for any injuries suffered. Cregan v. Marston, 126 N. Y. 568, 27 N. E. 952, 22 Am. St. Rep. 854; The Ida B. Cothell, 10 C. C. A. 634, 62 Fed. 765; The Egyptian Monarch (D. C.) 36 Fed. 773; The City of Alexandria (D. C.) 17 Fed. 390; The E. B. Ward, Jr. (C. C.) 20 Fed. 702; Carlson v. Association (D. C.) 93 Fed. 468; The Luckenbach (D. C.) 53 Fed. 662; Red River Line v. Smith, 39 C. C. A. 620, 99 Fed. 520; Same v. Cheatham, 9 C. C. A. 124, 60 Fed. 517.

The place provided by the vessel in which to perform the work was not unsafe or improper for the performance of work of this character. The proofs show that it rained on the morning of the day of the accident. At noon it cleared, and by the ship's log it appears that at about the time when libelant was injured the sun was shining bright. This would seem not to require an electric light in the forecastle. Steam from the winch was not escaping in such quantities as to obscure libelant's sight. I conclude that it is not seriously pretended that the escape of steam from the windlass in the forecastle contributed to the accident.

The libelant, therefore, was injured in the service of the ship, without fault, as I think, on his part. As before stated, he attributed the injury to the inexperience of the deck hand engaged with him in a common undertaking, and to the failure of the ship to provide a sufficient crew, as well a suitable place wherein to safely perform the work. Respondent alleges that libelant was injured solely on account of his carelessness and negligence in handling the line. It is not clear that he was careless, or that he did any act not prompted by faithful and expeditious discharge of duty in obedience of orders. Under these circumstances, I think that the libelant is entitled to be cured at the expense of the ship. Under direction of the captain of the Troy, shortly after the accident, he was removed to a hospital in Duluth, and there received medical attendance. He remained there for three and a half weeks, when he was brought by the steamship Troy to Buffalo, his place of residence. He then went to the house of a friend. Subsequently he went to the Marine Hospital in Buffalo, and remained there for three or four days, when he returned to the house of his friend, where he has resided ever since. The captain of the Troy testifies that after libelant left the ship at Buffalo he paid no further attention to the matter. Libelant incurred an expense of $75 for medical attendance at Duluth. No further care or attention was given him by the ship or its officers. He has suffered excruciatingly, and I think his sufferings were somewhat aggravated by failure to receive adequate medical attendance and care after his return home and during the healing of the wound. Prior to the accident he was strong, healthy, and vigorous. In the service of the ship he became crippled and helpless. It would seem to be peculiarly fitting for the application here of the doctrine announced in many cases in admiralty, that a seaman who sustains injuries in the service of a ship shall be cured at the expense of the ship. This libel was filed to recover $10,000 damages by reason of the injuries sustained, and in the prayer for relief libelant requests such other and further relief as to right and justice may appertain, and as the court may be competent to give. The power is inherent in the court to give such relief as the peculiar circumstances of the case require. The Lizzie Frank (D. C.) 31 Fed. 481. It has been frequently held that by the maritime law a seaman may be cured at the ship's expense, and is entitled to his wages to the end of his voyage, even though the accident was due to ordinary negligence of the seaman. Judge Brown, in The City of Alexandria, supra, announced the doctrine as applicable to a case where the injury was sustained by the negligence of a fellow servant. Other well-considered cases have followed the principle reaffirmed by The City of Alexandria. In Whitney v. Olsen, 47 C. C. A. 331, 108 Fed. 292, it is held that a seaman who receives an injury while in the service of the ship is entitled to medical care, nursing, and attendance, and to a cure, so far as a cure is possible, at the expense of the ship. This the respondent has failed to do. Its duty to the libelant was not ended by placing him in a hospital at Duluth, nor by carrying him to his home port. The ship was bound to take charge of and care for him until his wounds were healed. In the case of The Atlantic, Abb. Adm. 451, Fed. Cas. No. 620, the liability of a ship to its seamen when

injured in the service of the ship is ably considered by Justice Betts. He says:

"The term 'cure' was probably employed originally in the sense of taking charge or care of the disabled seamen, and not in that of positive healing. * * * To cure would involve impossibilities. * * * Thus broken limbs or bodily debility, resulting from services in the ship, are very often the sailor's heritage for the residue of his life."

In Brown v. Overton, Fed. Cas. No. 2,024, Justice Sprague says:

"A seaman disabled in the service of the ship is to be cured at the expense of the ship. To this his right is as perfect as to food or wages. It is incumbent upon the master to furnish means of cure, and use all reasonable exertions for that purpose."

In that case the ship was found blameworthy for failing to put in at St. Helena for the care and relief of a seaman who fell from aloft and broke both his legs. The ship was on her way from Calcutta to Boston. When the ship arrived at Boston no one paid any attention to the disabled seaman except to send him food from on shore. A few days thereafter it was proposed by the master to send him to the Marine Hospital, but at his request he was carried to the Massachusetts Hospital. The court held that failure to afford him medical attendance was an act of negligence on the part of the captain. A competent surgeon should have been called immediately, and suitable nursing and lodging should have been provided at the expense of the ship, either at the Massachusetts Hospital or elsewhere. It is true that the facts in the cases just cited are not strictly parallel to those presented by the case at bar. It is apparent, however, upon their examination, that the principle involved, which enjoins strict care upon the vessel to provide care for the seaman until a cure is effected, is clearly enunciated, and that that principle may be aptly applied to the present case.

No evidence is given on behalf of libelant from which the court may infer how soon his wound was healed after his return to Buffalo, nor whether he still required medicine and medical attendance; neither has any proof been offered tending to show the amount incurred for living expenses during the process of healing. Nevertheless I think that in view of the circumstances the libelant should be allowed, beside $75, expenses incurred for medical attendance at Duluth, the sum of $600 to cover his living expenses during the reasonable period in which he might recover, as well as to receive some compensation for the suffering which he undoubtedly has endured by reason of his not having such care and attention as the circumstances and nature of his injury required. The Eva B. Hall (D. C.) 114 Fed. 755.

Let a decree be entered awarding libelant the sum of $675, with costs.