## JULIUS A. SCHIRRMACHER *v.* THE SHIP "ERSKINE M. PHELPS," R. J. GRAHAM, claimant.

### Decided: October 15, 1903.

1. A seaman who is injured while in the service of the ship is entitled to medical care and nursing and to a cure, if possible, at the expense of the ship, and all reasonable measures must be taken to that end.

2. Where a seaman in the performance of his duty, and without fault on his part is injured in the service of the ship and there is no one aboard the ship competent to treat the injury. it is the positive duty of the master of the ship to take him to the nearest port where proper medical or surgical treatment can be obtained, and the failure of the master to do so is negligence for which the ship and its owners are liable.

3. Where a seaman is incapacitated for work through injuries received while in the service of the ship, he is entitled to his full wages to the termination of the voyage.

4. Where a seaman was shown to have fallen and broken his leg on board a vessel while said vessel was navigating Cape Horn during a storm, and there was no one on board the vessel who had surgical knowledge, the leg being rudely set by the first officer; and where it appeared that at the time of the accident the vessel was 484 miles from Port Stanley in the Falkland Islands, and over seven thousand miles from her port of destination, Honolulu, in the Territory of Hawaii, and the winds and currents were favorable to making the Falkland Islands in . less than two days, where surgical treatment could have been obtained for the injured seaman, and where it was further shown that within eleven days after the accident, the vessel was less than 900 miles from Valparaiso and less than 800 miles from Valdivia, both on the coast of Chili, where surgical aid also could have been obtained, and where it appeared that the master of the vessel made no attempt to make any of these ports, but continued his voyage to Honolulu, reaching that port two months after the injury occurred, the injured man having hurt the leg again in the interval through another fall, and being unable to walk without crutches or canes, and the leg being deformed and shorter than the other by reason of the overlapping of the bones due to the imperfect setting of the same, *Held,* that the master of the vessel was guilty of negligence in failing to put into the nearest port, as soon as possible after the accident happened, for surgical aid for the injured man, for which negligence the ship and its owners are liable, and damages awarded in the sum of $1,800.

IN ADMIRALTY.  LIBEL *in rem* FOR PERSONAL INJURIES SUS-
TAINED BY SEAMAN.

*T. McCants Stewart* and *J. J. Dunne,* for libellant.

*Holmes & Stanley* and *Robert W. Breckons,* for libellee and claimant.

ESTEE, J.  This is a libel *in rem* in admiralty filed on behalf of a seaman on board the ship "Erskine M. Phelps" for damages in the sum of ten thousand dollars for personal injuries sustained on board the ship while engaged in his duties as such seaman, on a voyage from Norfolk, State of Virginia, to Honolulu in the Territory of Hawaii.

Said vessel left Norfolk on May 1, 1903, arriving in Honolulu on the 15th of September, 1903.  While said vessel was navigating Cape Horn and during very stormy weather, on July 15th, 1903, the libellant, without any carelessness or negligence

on his part, was washed down on the deck by a heavy sea, thrown between the rails and stanchions of the ship with great force and violence and sustained a fracture of his right leg. Several others of the seamen were also somewhat injured at this time, but no one of them, so far as the evidence showed, suffered any serious damage save libellant.

There was no medical man aboard the vessel who could render any surgical aid to the libellant, but the leg was rudely bandaged by the mate, with cloths, and after a day placed in splints and rested in a sling attached to the ceiling over libellant's berth in the forecastle, where the libellant remained for some five weeks, when he was first assisted on deck with the aid of a cane and a crutch. He again slipped and fell, breaking the injured leg and had to be carried back to his berth, where he stayed until within a few days of Honolulu, when he was again helped on deck. The ship reached Honolulu on September 15, 1903, two months after the accident occurred, but it was not until the third day after reaching said port that libellant was removed to the United States Marine Division of the Queen's Hospital, by the captain of the ship, where he has since remained. The bones of the injured leg overlapped about an inch and a quarter, and libellant at the time of the trial was unable to walk save with the assistance of canes or crutches.

Although the allegations of the libel would seem to indicate an intention on the part of libellant to fasten the blame for the injury primarily on the owners of the vessel by reason of negligence in the loading of her cargo, resulting in a necessity to shift the same while navigating that well known dangerous locality, Cape Horn, and thus practically causing the injury to libellant by the listing of the ship, yet no evidence was introduced in pursuance of those allegations or tending to prove such negligence on the part of the owners of the ship.

As was said by this Court in the case of *Langaas v. The Barkentine "James Tuft,"* (¹) decided July 3, 1903:

"Among the positive duties which the owner of a vessel owes to its crew are to see that the vessel is seaworthy in all particulars; that it is provided with all necessary appliances for the

safety of the ship and of the men; that the ship is properly manned and provided with proper food supplies; and further, that in case of sickness or injury of any member of the crew, that he shall be given proper care and medical attendance. For a failure in the performance of any one of these duties, the owner of the ship is liable."

No proof was introduced in this case of a failure in any one of these duties except a neglect to provide proper medical care and attention for the injured seaman.

The case then narrows itself down into the single proposition of whether it was reasonably possible for the captain of the ship to have obtained proper medical care and attention for this man after the accident which resulted in the breaking of his leg.

At the time this man's leg was broken first, as is shown by computations made from the log of the first officer, the ship was less than five hundred miles, to be accurate some four hundred and eighty-four miles from Port Stanley, in the Falkland Islands; and as also appears from the testimony of the first officer, and by reference to his log, with winds favorable for making this port within two days. Honolulu, the port of destination, was then seven thousand seven hundred miles distant, or practically that amount, as the captain testified that 7700 miles was the distance from Cape Horn to Honolulu.

On August 6, 1903, the ship was less than nine hundred miles from Valparaiso, less than eight hundred miles from Valvidia, both on the coast of Chili; while on August 19th the ship was within 2028 miles of Tahiti and 2426 miles from Tai-o-hae, in the Marquesas. At all of these ports, it is well known, if not actually in evidence, that medical and surgical aid could have been obtained.

A seaman who is injured in the service of the ship is entitled to medical care and nursing and to a cure, if possible, at the expense of the ship, and all reasonable measures must be taken to that end. *Whitney v. Olson*, 108 Fed. 292; *The Troy*, 121 Fed. 901; *Brown v. Overton*, 1 Sprag. 462, Fed. Case 2024; *The City of Alexandria*, 17 Fed. 390.

This seems to be settled law. The injured seaman is to be cured at the expense of the ship, if the cure is possible; but all necessary steps must be taken to effect that cure, and these steps must be the usual and reasonable means employed.

The duty of the captain of a ship is to do all in his power for the safety of the lives and limbs of his men. He holds their lives and their health while on ship board largely in his keeping; and while the men must obey all lawful commands and do all they can in the line of their duty to preserve the ship and its cargo, they necessarily look to the captain and his officers for all reasonable care in case of sickness and reasonable aid in case of injury. Any man of common intelligence knows that a man not professionally educated in surgery, acting as the mate of a ship, cannot properly set a limb when broken, and the photographs of this man's leg, taken with the X-ray, show clearly that his limb was not properly set, although it was done with the primitive knowledge claimed to be possessed by the mate.

Notwithstanding the statements of Dr. Cooper to the contrary, I think a voyage of nearly seventy-seven hundred miles across the ocean is a severe test of the physical endurance of a man suffering with a broken leg crudely set by one admittedly without surgical knowledge.

In the line of the ship's duty to the seaman to provide him with medical aid, care and nursing, it was the duty of the captain of the ship to have put into the nearest port to have obtained such aid. While this duty must have been known to the captain of the ship, as he is an old navigator, yet not the slightest attempt was made by him, as the evidence shows, to go anywhere to seek such medical aid, but he simply continued on his long voyage to these islands.

The captain seemed to have been peculiarly indifferent in reference to the whole matter. He never went to see this man but twice, once immediately after the occurrence of the accident, again the next day, when he told him he could do nothing for him, but that the mate would attend to him. The captain himself testified that after ordering the mate to attend to libellant, he only saw him, with the exception of these two instances cited,

through the skylight of the forecastle where the man lay. In fact, he seemed to avoid coming in contact with him. And even after the vessel arrived in Honolulu, Captain Graham went "about the ship's business," as he testified, for nearly three days without having the libellant sent to a hospital where he could have received treatment. Libellant should have been sent to the hospital at once upon the arrival of the vessel and he should have been paid the wages then due him; and not have been sent alone finally to the U. S. Marine Division of the Queen's Hospital without any money, with but a slight knowledge of the English language, and unable to walk.

Where a seaman in the performance of his duty, and without fault on his part, is injured in the service of the ship, and there is no one on board competent to treat the injury, it is the positive duty of the master of the ship to take him at once to the nearest port where proper medical treatment can be obtained, and the failure of the master to do so is negligence for which the ship and its owners are liable. *The Iroquois,* 113 Fed. Rep. 964; *The Iroquois,* 118 Fed. Rep. 1003; *Brown v. Overton,* 1 Sprag. 462, Fed. Case No. 2024.

And this, too, without reference to any loss of time or risk to the cargo or to the vessel. *The Iroquois,* 113 Fed. Rep. 964.

As was said by Judge De Haven in the last above mentioned case—

"I cannot agree to the proposition that the sacrifice of time and risk to cargo are matters which can properly be permitted to outweigh the duty of procuring surgical aid for a seaman disabled in the service of the vessel when such assistance is necessary and cannot be obtained otherwise than by putting into port. The obligation of the ship is discharged only when the master has used reasonable care in providing for the comfort and cure of the seaman * * * But it would seem clear that if one of the crew were so ill or severely injured that anyone of ordinary judgment seeing him would know that his life or limb was in serious danger and that he ought to have medical or surgical aid at the earliest possible moment, then it would be the

imperative duty of the master to take the necessary steps to procure such aid if within his power."

In this case, there is no doubt but what it was within the power of the master of the ship to have procured this aid for libellant within two days after the injury occurred. According to the testimony of Captain Graham, the ship with favorable winds and all sails set could make two hundred and eighty-eight miles a day. On the day the accident occurred, the ship was some four hundred and eighty-four miles from the Falkland Islands, where at Port Stanley there could have been obtained the aid of competent surgical men. The winds and currents were favorable to take the ship there. It appears from the testimony of the first officer, Helbron, who made the log and had charge of it, that said log showed the position of the ship at that time to have been 58 degrees, 29 minutes south latitude, 65 degrees, 30 minutes west longitude, with the wind blowing northwest to west-northwest. The Falkland Islands were then east and north of the position of the ship. It is well known to navigators, and it appeared in evidence, that there is a sea current running eastward and northward from Cape Horn. The first officer, Helbron, testified that at that time the wind was west, the current setting north and east, and that in his opinion "they could have gone to the Falkland Islands if they wanted to."

The evidence is clear that at the time of the accident and after, strong westerly winds were blowing and continued, while the ship was see-sawing back and forth, beating to the westward. The winds and currents being so heavy, pushed the vessel backward in the direction of the Falkland Islands, to the eastward.

In view of these facts, it is reasonable to suppose that if the captain had had the well being of the libellant in view, and fully understood his duty in the premises, he would have changed his course and sailed direct for Port Stanley, which he could have reached in less than two days, if his testimony is correct that, with favorable winds, he could make two hundred and eighty eight miles a day.

The reasons given by Captain Graham for not putting back to Port Stanley were that it was a dangerous harbor; that his crew

were disabled and that he could not have made that port without great risk. In view of the fact that there is not a particle of evidence that any of the men injured or hurt on the fifteenth of July were at all seriously hurt with the exception of libellant and one man, Shulz, who stated that he was laid up for nine days, and in view of the further fact that he had then seventeen men remaining, his full crew of able-bodied seamen being nineteen, if I recollect rightly, the latter excuse does not seem sound; and especially from the fact that if the ship's course had been directed to Port Stanley, the winds and currents being shown to be favorable, it would have been easier to have made that port with a disabled crew than to have gone on fighting against the winds and currents with such a crew, (conceding that the vessel was short-handed for thirteen days), the length of time the rough weather continued, according to the captain's testimony.

As to the evidence of the captain and some of his witnesses, who were masters of vessels like himself, that the port of Stanley was a dangerous one to make, this seems directly contradictory of the history of that port. It is well known that for many years ships have put in there for supplies, and that now there are in the town of Port Stanley repair shops, where, in the language of a well known authority, the Encyclopaedia Brittanica (Werner's Edition, published in 1900), "ships can be repaired and provided in every way, much better and more safely than at any of the South American ports,—a matter of much importance, seeing that a greater amount of injury is done annually to shipping passing near Cape Horn by severe weather, than in any other locality in the world. The average number of vessels entering Stanley Harbor in the year is about fifty, with an aggregate tonnage of 20,000; of this number a fourth arrive in distress and are repaired at Stanley."

The evidence of the captain further disclosed that he could have reached Valparaiso within twenty-five days after the first accident occurred, and on August 6th could have sailed there in nine days. While there is some evidence showing that up to within thirty-seven hundred miles of Honolulu, he could more readily have reached the ports of Papeete, on the Island of

Tahiti, or Tai-o-hae, in the Marquesas, where surgical aid could have been obtained. Such a possibility never seemed to have entered into the calculations of the captain, as he made no effort to make any port but his port of destination. And while it is said libellant did not ask to be taken to the nearest port for aid, yet that did not relieve the captain of his duty in the matter. The former may have been ignorant of his rights and so failed to ask to have them enforced.

I am of opinion that the captain was negligent in not taking the course the law required of him, namely, to have put into the nearest port, and the ship and owners thereof are liable for such negligence.

While the bones of this man's leg have knit, yet it is in evidence that the fractured bones overlap an inch and a quarter, which causes a consequent shortening and deformity of the leg. He is unable to walk without the aid of a cane or crutches; while from the testimony of the medical witnesses it will be at least a year from the time of the accident before he is able to have a natural muscular use of the leg and resume his vocation as a seaman.

If this man had had proper medical care within a reasonable time after the injury he might possibly still have a leg which, while not as perfect as the uninjured one, yet the deformity would not be apparent and he would have been saved the pain and suffering incident to the two months during which he was without medical assistance, and during which time he again injured the leg by falling, entailing more pain and suffering.

Libellant shipped aboard this vessel on the first day of May, 1903, and the vessel reached this port on the fifteenth of September, 1903. He was to receive $18 a month as wages. None of this wage has been paid him so far as the evidence shows, and he is therefore entitled to the sum of $81 wages for four months and a half, as while he was incapacitated from work during a portion of that time, such incapacity arose from injuries received while in the service of the ship. Desty Shipping and Admiralty, Sec. 155, and cases there cited. I cannot, however, award

him that sum in this action as no demand is made for the same in the libel.

Libellant is entitled to damages for the pain and suffering and the injury he received by reason of the failure of the captain to seek a port where medical aid and attendance could have been obtained as the law requires, and which he could have obtained by going into the nearest port, which in this instance was either Port Stanley, in the Falkland Islands, or failing in that, then Valparaiso or Valdivia on the coast of Chili. I will award the libellant in full for all such damages, excepting the wage which should have been paid him upon the termination of the voyage, the sum of eighteen hundred ($1800) dollars, together with costs of suit.

Let judgment be entered accordingly.

(1) See Ante, P. 420.