## RED RIVER LINE v. CHEATHAM.

### (Circuit Court of Appeals, Fifth Circuit. January 2, 1894.)

#### No. 162.

1. ADMIRALTY APPEALS—NEW EVIDENCE—WHEN ALLOWED.
   New testimony will be admitted on appeal when the court is of opinion that, under all the circumstances, substantial justice requires it, although a perfectly satisfactory excuse is not given for failing to produce the testimony below.

2. SHIPPING—NEGLIGENCE—LANDING OF RIVER STEAMERS—CUSTOM.
   It is the general usage on the Mississippi and its branches to land steamboats having stages operated by steam, for the delivery of small quantities of freight, by running the bow into the shore, and holding the vessel in position by revolutions of the wheel, without putting out lines; and therefore any risk attendant upon this method is assumed by the employés whose business it is to pass over the stage in delivering or receiving freight. 56 Fed. 248, reversed.

3. SAME—FELLOW SERVANTS.
   Negligence of a steamboat fall tender selected from the crew, in slacking the fall controlling a stage operated by steam so as to cause the drowning of a member of the crew, is negligence of a fellow servant, for which the owner is not liable.

Appeal from the District Court of the United States for the Eastern District of Louisiana.

This was a libel in personam filed by Thomas Cheatham, as tutor of Bernice, Ruby, and Maggie Brooks, against the Red River Line, to recover damages for the drowning of James Brooks through

the alleged negligence of the defendant. There was a decree below for $2,500 (56 Fed. 248), and defendant appeals.

Suit was brought in the court below by libel in personam against the Red River Line, a corporation created under the laws of Louisiana, owner of the steamboat Valley Queen, in the Mississippi and Red river trade, and against George W. Rea, master of the Valley Queen, for damages accruing to the minor children of James Brooks through the drowning of the said Brooks at a landing on Red river on the up trip of the Valley Queen, May 16, 1892. The gist of the libel in relation to the death of Brooks is found in the third and fourth articles thereof, as follows: "Third. That, said steamboat having some freight on board to deliver at said East Point, said Rea, master, directed a landing to be made there, but failed and neglected to have said steamboat moored or fastened to the wharf or bank by lines, chains, or other fastenings, and attempted to hold said vessel to the bank by her wheel,—the engine being kept going,—which libelant alleges to have been gross carelessness and negligence on the part of said master, particularly in view of the fact that Red river was at that point swollen with floods, and that the current of the river was then and there unusually rapid. Nevertheless, by directions of said master, the stage plank was lowered to the bank, and the deck hands, including James Brooks, were ordered to take the freight for East Point off said steamer, to a warehouse at said East Point on or near the bank of said river, which the deck hands, including said James Brooks, did. That as the last deck hand left the stage plank, to carry to shore some of the said goods, the said master, not giving sufficient time for the deck hands to put the freight on shore, and return to the boat, tapped the bell, and ordered the boat backed out, and cried out, 'Come aboard,' 'Come aboard.' That thereupon the dock hands, including said Brooks, ran to the stage plank, which had then, in consequence of the motion of said steamboat, fallen into the river at the shore end. That some of the hands managed to scramble on board. While they were going on board, said master ordered the men on deck to throw the fall off the capstan, to lower the stage. That one deck hand caught at the stage, but missed his hold, and was swept away and drowned. That the said James Brooks climbed up on the stage, the boat meanwhile still backing out. That in consequence of the grossly careless action and orders of said master, while said Brooks was climbing to the stage, it turned up on edge, and fell into the water, clear of said boat, falling on said Brooks. That the said Brooks swam down, and caught the wheel of the boat. That thereupon men on shore and men on the boat, who were witnesses, immediately cried out to stop the wheel; that the man had caught it. That these cries were in the hearing of, and were heard by, said master, Rea, who nevertheless willfully and cruelly refused to have said wheel stopped, or to take any action to rescue said Brooks, who was then and there thrown by the revolution of said wheel violently into the rapidly flowing and swollen river, and then and there drowned. Fourth. That the said James Brooks came to his death because of the gross negligence and willful carelessness of the said master, in not fastening said steamer to the wharf or bank in making said landing; in not giving the deck hands sufficient time to take off the freight, and get back on board; in attempting to hold said steamer to the bank by the revolution of her wheel; in the orders which he gave to the men on deck with regard to the stage plank, in consequence of which said stage plank turned on edge, and fell into the river; and in not stopping the wheel when he was informed that said Brooks was clinging to it, and not making any effort to rescue said Brooks from the imminent peril in which he was placed by the gross and willful negligence and carelessness of said Rea as aforesaid." To these articles of the libel the respondents answered as follows: "That the third article of said libel is true in part, and in part untrue, and its allegations are denied, except as herein admitted. The truth is that the said steamboat, as is usual and customary, did make a landing at East Point, on Red river, on its up trip, and did not fasten the boat to the bank; its stem being pointed up the river, and it being held in position with its nose to the bank, and as has been done from time immemorial, and well known to all seafaring and river men, as well as laborers. That it is true a few barrels of freight were ordered taken off

said steamboat to land at said point, and said work was duly and properly performed by a number of said laborers on board, including the said James Brooks, and that ample and sufficient time was given and granted for the purpose of returning on board the boat, but that the libelant neglected and refused to return to said boat in due time. That the various orders given to him in the premises to return to said boat were disobeyed by him, and that everything requisite and proper was done to have said Brooks return to said boat, without avail; he persisting in having his way in regard to what he should do, regardless of the orders given him. Fourth. To the fourth article of said libel, respondents answer and say that the same is untrue, and the allegations are specially denied, and the truth is that the respondents and the master and officers of said steamboat did everything in their power to have said James Brooks return to said steamboat, and that there was no fault and no negligence on their part, in any manner, in any of the premises. That no damage whatsoever was sustained by said James Brooks, nor by any one dependent upon him, for which respondents are liable; and respondents specially deny any liability to any one claiming to represent them, as being responsible in the premises. And respondents aver that if said Brooks was injured in the premises by any cause, save his own recklessness and neglect, it was by the neglect of a fellow servant or fellow servants, the risk of which he assumed."

On the hearing the court below dismissed the libel as to George W. Rea, master, but found the boat in fault, and condemned her owner, the Red River Line, to pay to the libelant the sum of $2,500, with legal interest from the 17th day of May, 1892; basing its opinion as to the liability of the defendant corporation upon the fact that the boat made the landing, and required James Brooks, employé, to cross and recross the stage plank without the boat being moored, and that this was the substantial cause of the death of Brooks. An application for rehearing was made, based on the ground, among others, that the court erred in holding that there was anything improper or unusual in the method of landing and holding the boat at East Point, under the circumstances set forth in the testimony; it appearing that said landing was usual and proper and necessary, and that, without such landing, navigation upon said river would be at an end. The rehearing was refused on the ground that there was no testimony in the record as to the general usage of vessels upon the river; that the only custom or usage proven in the case was the custom of the particular boat, the Valley Queen, and the only reason given why the precaution should not be taken of tying the boat was that it would take too much time. Since the appeal to this court, and upon a petition showing "that ample testimony, in the view of counsel for respondents in the district court, was taken before the trial of said cause, and filed in evidence therein on the trial of said cause; that no point was raised as to its sufficiency, nor as to the point involved, of a steamboat tying or not tying to the bank of a river whilst ascending a stream, but that respondents were taken by surprise in the ruling of his honor, the district judge, in first maintaining that the want of such tying caused the injury complained of, from the judgment on which this appeal comes before this honorable court, and in his afterwards maintaining said opinion on application for rehearing, against what appellant was advised to be a great array of evidence; and it is material and necessary, in order to prevent a failure of justice, that further and additional testimony be had herein, under the rules of court,"—and upon leave obtained from one of the judges, the appellant has taken the testimony of a number of steamboatmen, masters and others (12 in all), to show that it is the general custom and practice of steamboats having stages operated by steam power to make landings in all stages of water, and deliver and receive freight, without mooring the boat to the shore by lines, but using the wheel to keep the boat in position, if necessary, and that this custom is reasonable, proper, and necessary to the saving of time and the dispatch of business, and is generally known among all steamboat officers and crews.

W. W. Howe, S. S. Prentiss, and W. S. Benedict, for appellant.
M. Marks, for appellee.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

PARDEE, Circuit Judge (after stating the facts as above). The first matter to be considered is the motion of the appellee to exclude the evidence as to the custom of landing steamboats on the Mississippi river and its branches, taken, since the appeal, in this court, on the ground that the same should have been taken in the court below, if taken at all, and no sufficient reason or excuse is given for taking it in this court. In The Beeche Dene, 5 C. C. A. 208, 55 Fed. 526, this court recognized as the proper rule on the subject of taking testimony in this court the rule declared in The Mabey, 10 Wall. 420, which is that testimony can only be taken in cases in admiralty, on appeal, when it appears that the testimony is material, and a good excuse for not offering it in the trial court is given. We are not satisfied that a perfectly satisfactory excuse is given by the appellant for not taking the testimony in question in the lower court, where the issue as to the custom in the premises was plainly made by the defendant's answer; but we are of the opinion that substantial justice requires the admission of the testimony in this court, under all the circumstances of the case, and that all prejudice resulting to the appellee because it was not taken in the court below can be corrected in disposing of the costs of the case.

The appellant makes two points in this court, each tending to deny all right of action to the appellee:

(1) It is submitted that there is no right of action, under the law of Louisiana, against the Red River Line, under the circumstances set forth in the libel; that article 2294 of the Civil Code of Louisiana does not apply, and the articles 2295 and 2299 have never been amended so as to give any survivorship of action, or right to damages to survivors. This objection was considered in the case of Sugar-Refining Co. v. Johnson (recently decided), 60 Fed. 503, and need not be further considered here.

(2) That it has never been held by the supreme court of the United States that a claim for damages resulting from the wrongful death of a person on the high seas, or on the waters within the admiralty jurisdiction, survives in admiralty, even when the death occurred within the territory of a state where the law provides for recovery in like cases.

In view of the conclusion reached on the merits of the case, we do not find it necessary to pass upon this question, nor upon the further objection suggested by brief, but not presented in the court below, that this present action cannot be maintained because of the act of congress entitled "An act relative to the navigation of vessels, bills of lading and certain obligations, duties and rights in connection with the carriage of property," approved February 13, 1893 (27 Stat. 445).

On the merits the case shows that at about 7 o'clock p. m., May 17, 1892, the steamboat Valley Queen (George W. Rea, master), on a trip from New Orleans to Shreveport, made a landing at

East Point, on Red river, to deliver some 8 or 10 boxes and barrels of freight. The landing was made without putting out any lines, or in any manner mooring the boat to the shore, but by lowering the stage to the bank, it being intended by the master in immediate command that the boat would be held to the bank by slow revolutions of the wheel. A portion of the freight to be delivered was carried ashore, over the stage, by some 10 or 12 of the crew (James Brooks, deceased, among the number), to a warehouse some short distance from the bank, the boat being actually kept in position by working her engines slowly. Meanwhile, the bank was caving, and did cave to such an extent that the stage was left suspended by the fall. Three of the crew got on the stage to return to the boat, and while thereon the fall tender let go the fall, lowering the stage, by which the outer end struck the current, and the same tilted; throwing James Brooks, one of the men on it, into the water. Brooks was swept down past the boat to the wheel, which he caught, but, not being able to maintain his hold, dropped off into the river, and was drowned. The river was high, and rising, at the point where the landing was made. The current was unusually swift and strong. There were many whirlpools, and the banks were caving rapidly.

As we view the evidence, but two points are necessary to consider:

(1) Was it negligence on the part of the master, for which the owner is liable, to have landed the Valley Queen at the place in question, when the river was high, the current strong, and the bank caving, without mooring the said boat to the bank by lines before attempting to deliver freight across the stage to the warehouse on the bank?

(2) Was the owner liable for the negligence which resulted in the death of James Brooks, because sufficient care and diligence were not used by the master in selecting a competent fall tender?

The learned judge of the court below found that it was negligence on the part of the master to have landed the boat under the circumstances mentioned, and that there was no such proof of general usage of vessels upon the river in making such landings as would justify the master therein, or excuse the owner. We find in the case that, as a matter of fact, there were at the landing in question no trees, or other natural objects, to which the boat could have been tied, in order to make the landing, and that the check posts which had been placed in the bank for such use if necessary had either caved into the river, or were submerged by water. And we find by the evidence taken in this court that the general usage of vessels navigating the Mississippi river and branches is to land steamboats, having stages operated by steam, for the delivery of small quantities of freight, by running the bow into the shore, and holding the vessel in position by the revolutions of the wheel, and without putting out lines, and this, at all stages of the river; and we further find that this general usage facilitates the rapid delivery of freight and passengers, and is not attended with unusual risk. The general usage in the busi-

ness being proved, and being known to all steamboat hands and employe's, it follows that the risk attendant upon such method of landing steamboats is incidental to the employment, and assumed by the employe'. Therefore, if the proximate cause of James Brooks' death was the landing of the steamboat Valley Queen, under the circumstances detailed in the libel, the owner cannot be chargeable therewith, nor liable therefor.

The evidence shows that the negligence of the fall tender was very likely the proximate cause of Brooks' death. The preponderance of evidence is that the master of the vessel ordered the fall tender, when the bank caved, and at the time that Brooks was on the stage returning to the steamboat, to hold onto the fall, but that instead of holding onto the fall, which sustained the stage, and kept it from tilting, he let go the fall; thereby letting the stage tilt and fall into the river, throwing James Brooks off into the river. The fall tender was selected by the master from among the crew, and, so far as the record shows, was of the average intelligence and capability. His own evidence with regard to the matter in hand is that he slacked up the fall because the captain ordered him to slack it up, and it is likely that he so understood the order; but he further testifies (evidently in answer to a question as to whether he heard anybody call out from the shore) that:

"Everybody was hollering. It looked like everybody was a-hollering. Everybody around the stage was a-hollering. I can't tell you who it was, but there was commotion and excitement just like when there is an alarm,—when there is a man drowned."

Our conclusion on the whole case is that, so far as James Brooks came to his death through the landing of the steamboat at the time and under the circumstances referred to, it was through one of the risks incident to his employment, and that, so far as the act of the fall tender was a proximate cause of, or contributed to, his death, the act was attributable to the negligence of a fellow servant, and that for neither is the owner liable.

The decree of the district court should be reversed, and the cause remanded, with instructions to dismiss the libel, with costs in the district court; but the costs of appeal, and of this court, should be adjudged against the appellant. And it is so ordered.