## TEXAS & N. O. R. CO. v. MURRAY.

(Court of Civil Appeals of Texas. El Paso. February 24, 1913. On Rehearing, April 10, 1913. Second Rehearing Denied May 8, 1913.)

1. MASTER AND SERVANT (§ 296*)—INSTRUCTIONS—MISLEADING INSTRUCTIONS.

An instruction, in an action for injuries to a section man while moving a push car, that, though the railroad company's negligence was the proximate cause of the injury, yet if plaintiff failed to properly hold the car or to guard against the motion thereof, and thereby contributed to the injury, the verdict must be for the company, "but, if you do not so find, let the verdict be determined on the other issues submitted," was not misleading as leading the jury to find for plaintiff if his failure to properly hold and steady the car or to guard against the motion thereof did not contribute to the injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1180–1194; Dec. Dig. § 296.*]

2. TRIAL (§ 260*)—INSTRUCTIONS—REFUSAL TO GIVE INSTRUCTIONS COVERED BY THE CHARGE GIVEN.

It is not error to refuse a special charge substantially embodied in the general charge.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. § 260.*]

On Rehearing.

3. APPEAL AND ERROR (§ 1067*)—INJURY TO SERVANT—ASSUMPTION OF RISK—EVIDENCE—INSTRUCTIONS.

Where, in an action for injuries to a section man while moving a push car, the plea averred that the injuries were the result of risks ordinarily incident to the service and known to plaintiff, and the evidence showed that a coemployé lost his balance and threw the car against plaintiff, and the court charged that, if the coemployé's failure to exercise ordinary care was the proximate cause, the verdict should be for plaintiff, but, if the coemployé was without any want of ordinary care on his part, the verdict must be for defendant, the refusal to charge the law of assumed risk, as applied to ordinary risks incident to the service, was not prejudicial to the company.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4229; Dec. Dig. § 1067.*]

4. DAMAGES (§ 158*) — PERSONAL INJURIES — PLEADING.

A petition in an action for injuries to a section man while moving a push car, which alleged that a coemployé negligently permitted the car to be thrown against plaintiff's leg, thereby injuring it, that plaintiff went back to work, that about two weeks after he undertook to move heavy timbers, but his leg, from the blow from the car, gave way, that the injury progressed to a condition of permanency, that about a month after the accident he slipped on his injured leg and sustained injuries which made him a permanent cripple, and that, as a proximate result of the blow from the car, the muscles and nerves of the leg became impaired, on account whereof the leg gave way, causing the fall, sufficiently showed that the injuries. were directly caused by the blow, or, if not, by the giving way of the leg when plaintiff was lifting the timbers or when he slipped and fell on the floor, and in either event the injuries were the proximate result of the blow, authorizing a recovery, if sustained by proof, for all the injuries.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 441–444; Dec. Dig. § 158.*]

5. DAMAGES (§ 185*) — PERSONAL INJURIES — EVIDENCE.

Evidence *held* to support a finding that the condition of one suing for a personal injury was due to a blow on his leg, negligently inflicted.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 503–508; Dec. Dig. § 185.*]

6. DAMAGES (§ 132*) — PERSONAL INJURIES — EXCESSIVE DAMAGES.

A verdict for $7,000 for a personal injury, resulting in plaintiff becoming a hopeless and permanent cripple by reason of a fracture of the thigh bone, would not be disturbed as excessive.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 372–385, 396; Dec. Dig. § 132.*]

McKenzie, J., dissenting in part on rehearing.

Appeal from District Court, Harris County; Charles E. Ashe, Judge.

Action by W. J. Murray against the Texas & New Orleans Railroad Company. From

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

a judgment for plaintiff, defendant appeals. Affirmed.

Baker, Botts, Parker & Garwood and Lane, Wolters & Storey, all of Houston, for appellant. Presley K. Ewing, of Houston, for appellee.

McKENZIE, J. This is a suit by W. J. Murray against the Texas & New Orleans Railroad Company to recover damages for personal injuries alleged to have been sustained while employed by defendant as section laborer in its yards in the city of Houston. A former appeal of this cause is reported in 132 S. W. 496. The petition upon each trial being the same, we refer to the reported cause, supra, for a fair statement of the plaintiff's pleadings. The defendant answered by general denial, pleas of contributory negligence, assumed risk, and unavoidable accident. The trial from which this appeal is taken was had on June 22, 1911, and resulted in a verdict and judgment for plaintiff for $7,000.

[1] The first assignment of error complains of the following charge of the court: "Although you may find that defendant was negligent towards plaintiff, and that such was a proximate cause of alleged injuries to him, as before submitted, yet, if you believe from the evidence that plaintiff, while engaged in assisting in the moving of the car, failed to properly hold and steady the car, or failed to look out and guard against the motion thereof, so as to avoid contact therewith, and that in either or both of these particulars he failed to exercise such care as an ordinarily prudent person would have exercised under the same or similar circumstances, and that he thereby contributed to the alleged injuries of which he complains, if sustained, then let the verdict be for defendant, but, if you do not so find, let the verdict be determined on the other issues submitted to you."

Appellant contends in its proposition that if the plaintiff failed to properly hold or steady the car or to guard himself against the motion thereof, and his failure so to do caused the car to strike him upon the leg, then such failure was the proximate cause of his injuries, and it was therefore error for the court to submit the question of proximate cause to the jury. Under the assignment and proposition, appellant contends that the charge is practically correct but for the concluding part thereof, which is as follows: "But, if you do not so find, let the verdict be determined on the other issues submitted to you"—contending that the jury was instructed, in effect, to find for the plaintiff if plaintiff's failure to properly hold and steady the car or to guard against the motion thereof did not contribute to the injury. We are of the opinion that the charge is not susceptible to the criticism as made. The words complained of only import what would have been implied without them (that is, if the jury did not find the facts to be as submitted in the charge, then they should look to the other part of the charge in arriving at their verdict); and, the charge given being an affirmative presentation of the issue to the jury of plaintiff's contributory negligence, the jury could not have been misled thereby.

[2] Appellant's second assignment of error complains of error on the part of the trial court in refusing a special charge on the issue of contributory negligence, which special charge is in practically the same affirmative terms as was submitted by the court in the general charge. We therefore overrule this assignment.

The third assignment of error complains of the action of the trial court in failing to charge upon assumed risk. Upon the trial of the case appellee testified, in substance, as follows: "I had been working there for the railroad company at the time I got hurt I think, about three months, as well as I can remember; I had been working for the Texas & New Orleans at that particular job about three months; as to how far back from that time I had first commenced working for any railroad, I don't remember, sir, to tell you the truth about it; I think it was a year or so before I commenced working for a railroad. I was not doing any skilled work, just lifting, laboring work. I had been working for this defendant, the Texas & New Orleans Railroad Company, about three months at that kind of business, working with a crew that was handling piling; and, in moving the piling from wherever it was to the place to be used, we used a push car (that is, a small car with two trucks, or four wheels, with four handles, two on each end); when it is not loaded, when it has no load on it, it is a tolerable light car, just has a light wooden frame on it over the truck. * * * When we got back to where we wanted to take it off of the railroad, the main track, we had a little track that came up for the purpose of taking it off and leading it into the house; this track approached the main track at right angles; when we got it off, we did not have any switch to run it on, and we four men would get hold of one of those handles and lift it up, turn it around, and put it on the other track and roll it into the house, and that was what we were doing to it, and in doing that it became necessary to turn the car half around, just back it up, carry it around to the other track, so as to set it down; we just picked it up like this, like two tracks; you come up on this one, you turn far enough to get on that one, just pick it up and turn; the track we were on ran east and west practically, the one we were working on, and at the time we approached the track we took it onto; we were going east, and I got hold of the northeast corner

of that corner, and that would compel me then, in making that trip around, to pass over one of the rails of the main track and reach one of the rails of that approaching track, and it would require Mr. Gibson, my assistant; he was the one on the same end of the car I was; he was on the northwest corner; he was at the same end, but the northwest corner; and he, in lifting there, would have to pass over the eastern rail of that track that approached the main track and reached the other to set it down, and that is what we were all doing at the time I got that first injury above the knee."

Gibson, a witness for appellee, testified: "At the time the accident occurred, Murray and I were taking a push car off of the main line * * * and endeavoring to place the same on a track leading to a shop near by. * * * The car was at a place on the said track even with and directly in front of a track leading to a shop. * * * There were two other men besides Murray and myself engaged in moving the car; Murray was on one side at one end; I was on the other side, at the same end, and the two other men were at the other end of the car. * * * This track leading to the shop ran in a direction almost at right angles to the main line track. * * * Each of us four men took hold of a corner of the car. The end of the car at which I was located had to be moved toward Murray, who was at the same end of the car with me but on the other side of the same. This was necessary in order to point the car in the direction that the track was going to shop led. In carrying my end of the car around, I stumbled on one of the rails; this was caused by my not lifting my foot high enough, and my foot, as a result, hit upon the rail of the track. My stumble caused me to lose my balance and throw the car against Murray; my stumble caused me to throw the car against Murray. I knew the rail was there; there was no necessity of my hitting the rail with my foot; I did not lift my foot high enough to escape hitting the rail, because I was not thinking of it; I forgot to do so; it was carelessness on my part in not looking for the rail; I knew it was there. * * * We were handling the push car in the usual and customary way of doing so in removing it from one track to another. The car was not loaded. I did not intend to strike the rail with my foot; I just wasn't thinking about or looking out for the rail."

The witness Dooley, who was helping in moving the push car at the time of the accident, testified: "In moving those push cars from one track to the other, as we were all doing, it is frequent to stumble or slip and let the car drop that way. It is very frequently the case. * * * A man can stumble most any time when he is walking, even if he is not on the rails; he can stumble without being careless and by being careless."

The appellant asked a special charge, which was by the court refused, as follows: "You are instructed that the plaintiff, in entering and remaining in the service of the defendant railroad company, assumed the risk of dangers and injuries which were ordinarily incident to the service which he engaged to perform, and also the condition and dangers that were open to his observation and were actually known to him, or would necessarily have been known to him by the exercise of ordinary care in connection with the performance of his duties. Therefore, if you find from the evidence that the plaintiff's alleged injuries were the result of risks or dangers that were ordinarily incident to the service, or risks and dangers which were known to the plaintiff, or would necessarily have been known to him before his injury by the exercise of ordinary care in connection with and consistently with the performance of his duties in the service, then, in such event, you will return your verdict in favor of the defendant railway company."

The testimony, therefore, shows that Murray had been engaged in the character of work he was doing for some time, was experienced, and had full knowledge as to the method in which the work was being done, and was participating in the work of moving the car at the time he received the injury complained of. The moving of the car as was being done was in the ordinary performance of the duties of that employment. No claim is made that the men helping Murray move the car were incompetent or that the car was in any manner defective. The car was being moved in the ordinary way, and, from the position assumed by Murray, the car was required to be moved towards him that it might be placed upon the spur track leading to the shop, and this required some of the men to pass over the rails of the track while lifting the car. Murray must have known the effect that a misstep or a stumble by Gibson would have upon the car, and must have known the resultant danger thereof.

It is a well-settled principle of law that a servant assumes all the risks which are naturally, ordinarily, and reasonably incidental to his employment. This principle is based upon the presumption that a person who enters a certain service understands its nature and understands and appreciates the dangers ordinarily incident thereto, and if he is injured by any risk ordinarily incident to the employment, or by reason of improper method of carrying it on in which he participates, he cannot recover.

St. L. & S. W. Railway Co. v. Brisco, 100 Tex. 354, 99 S. W. 1020, was a case where a railway section hand sued for injuries by

the negligence of the other section hands engaged with him in putting a hand car on the track and in pushing the car upon him with unnecessary speed and violence; there being evidence that the work was being carried on in the usual manner, with which the plaintiff was familiar, and upon the trial of the case the defendant requested a charge upon the issue of assumed risk. In that case our Supreme Court said: "The court erred in not giving the charge set out in the statement submitted. There was evidence from which the jury might have found that the hand car was uniformly placed upon the track by giving it a hard push to get it over the first rail of the track. This was the method of doing the work, and they might also have found that Brisco was daily engaged in assisting them put the car on the track as he was engaged on that occasion, and knew of the manner in which his fellow servants uniformly performed that work. The jury might have found that the car on this occasion was shoved as it usually was, and with no more force. The evidence is conflicting upon these issues; but the jury might have concluded that Brisco assumed the risk of putting the car on the track in the manner in which it was done. One who is engaged in the performance of work in a manner well known to him must be held to assume the risks of danger which are involved in the performance of that work in that way. There was no conflict in the testimony as to the fact that Brisco had been engaged in performing this character of work (that is, putting the car upon the track) for some time; that he was experienced and had full knowledge as to the method in which the work was done. He was participating in the work on this occasion, and the facts bring it within the rule laid down by this court in Gulf, C. & S. F. Ry. Co. v. Huyett [99 Tex. 630] 92 S. W. 454 [5 L. R. A. (N. S.) 669]."

Experience common to everyday life teaches that men engaged in a work of lifting heavy objects, such as a push car, frequently make missteps or stumble. It teaches that ordinarily four men engaged in moving a car would not likely move in the same direction uniformly at the same instant. One corner of the car might be raised higher than some other corner, which would shift the weight to the lower corner; this might be because of the discrepancy in the natural height of the men, or the unevenness of the ground, or because of the lifting of the car over the rails of the track which project some distance above the ground. In passing over the rails the men are necessarily required to raise their feet higher than in ordinary walking. For any or all of said reasons, men engaged in the work are often placed in awkward positions which would cause them to make a misstep or stumble, which would seem to be a mere incident in the performance of that character of work. Certainly it could not be said that to stumble or make a misstep under the conditions enumerated would be unusual, unnatural, or unreasonable. As testified to by the witness Dooley: "It is frequent to stumble or slip and let the car drop that way. * * * A man can stumble most any time when he is walking, even if he is not on the rails. He can stumble without being careless and by being careless." The testimony, when weighed in the light of the character of work being performed, raised the issue of assumed risk, a defense which should have been submitted to the jury under an affirmative charge. The charge which was requested by the defendant upon the trial appears to us to be correct, and should have been given, in the absence of any charge upon the issue of assumed risk in the main charge. The assignment of error is sustained.

We think the case at bar is very similar to Railway Co. v. Brisco, supra. The negligence in that case complained of was the acts of the servants in pushing the car with unnecessary speed and violence, which negligence is very similar to the negligence as disclosed by the testimony in the case at bar.

We deem it unnecessary to consider the fourth and fifth assignments of error in view of the fact that the cause will be reversed and remanded for a new trial.

Reversed and remanded.

HIGGINS, J. (dissenting). The ground of negligence set up in plaintiff's petition as the basis of the recovery herein sought is that plaintiff was, "at the time of the casualty herein complained of, engaged with other employés of defendant, in the ordinary discharge of the duties of their service, in the operation of a hand or push car for defendant, and while they were engaged in moving such push car from the rails of one of defendant's tracks to another track, as incidental to and as a part of its operation, one of said employés of defendant (one Gibson) did, without warning to plaintiff, so negligently conduct himself in handling the end or part of the car he was holding as to cause or permit it to fall upon or be thrown against plaintiff's leg and to strike the thigh thereof a few inches above the knee with great force and violence, whereby," etc., setting up the injuries complained of. Defendant answered by (a) general denial, (b) contributory negligence, (c) that the act of negligence complained of was that of a fellow servant, for which defendant was not liable, (d) assumed risk, (e) unavoidable accident.

The plea of assumed risk is as follows: And for further plea and answer the defendant avers that plaintiff ought not to have and recover anything herein for the reason that his alleged injuries were the result of risks and dangers ordinarily incident to the service in which he was employ-

ed, and of risks and dangers and conditions which were open to his observation and known to him, and which would necessarily have been known to him by the exercise of ordinary prudence in the performance of his duties, and of this defendant puts itself upon the country and prays judgment of the court."

The special charge, the refusal of which it is held constitutes reversible error, reads: "You are instructed that the plaintiff, in entering and remaining in the service of the defendant railroad company, assumed the risk of dangers and injuries which were ordinarily incident to the service which he engaged to perform, and also the conditions and dangers that were open to his observation and were actually known to him, or would necessarily have been known to him by the exercise of ordinary care in connection with the performance of his duties. Therefore, if you find from the evidence that the plaintiff's alleged injuries were the result of risks or dangers that were ordinarily incident to the service, or risks and dangers which were known to the plaintiff, or would necessarily have been known to him before his injury by the exercise of ordinary care in connection with and consistently with the performance of his duties in the service, then and in such event you will return your verdict in favor of the defendant railroad company."

I am of the opinion that the general charge of the court amply and fully protected defendant in the only right it could possibly claim under the law of assumed risk, as applied to the facts disclosed by the record here.

It is held in the majority opinion that, if Gibson's stumble or misstep was not due to negligence, it was then an ordinary risk incident to the service in which he was employed, and therefore assumed by plaintiff; and, such being the case, the charge upon assumed risk should have been given.

The rule as to the assumption of "ordinary risks" is not of any practical importance; in fact, the rule, as it is usually stated, that a servant assumes all of the ordinary risks incident to the service in which he is employed is misleading, since the theory upon which the master is held to be not liable is that he was not negligent, and in such cases, of course, no recovery can be had, independent of any question as to the assumption of risk. It would therefore seem that, if the master is held to be negligent, the question of assumption of "ordinary risks" cannot arise as a material point; neither can it arise as a material point if the master is held to be not negligent. The master's liability depends wholly upon his own negligence or that of his servant; this must be established affirmatively in every case. If he has performed his duty, there is no negligence and he is not liable; and in such case it is not of the slightest impor-

tance what risk or perils the servant may have assumed. If there is negligence of the master or of the servant, then the master is liable because the servant does not assume as an "ordinary risk" such negligence; therefore, in this case, too, it is not of the slightest practical importance what risk or perils the servant has assumed. 2 Bailey, Personal Injuries (2d Ed.) par. 369; Bradburn v. Railway Co., 134 Mich. 575, 96 N. W. 929. Hence we see that, as applied to "ordinary risks" incident to the service in which the servant is employed, the doctrine of assumed risk eo nomine has no practical importance, since the question of liability, in its last analysis, depends upon the issue of negligence vel non. If the master or his servant was negligent, liability attaches. If there was no negligence, there is no liability.

Now, in the instant case, this controlling issue of negligence vel non upon Gibson's part in stumbling was clearly and decisively submitted, and therefore, from a practical standpoint, defendant had adequately protected every right which he could possibly claim upon the theory that the misstep or stumble was accidental and an "ordinary risk" incident to the service in which appellee was engaged.

The jury was instructed: "Now, if you believe from the evidence that plaintiff was injured substantially in the manner alleged, and that at the time he and coemployés were engaged in moving the push car in question from one track to another as a part of its operation, and that while so engaged they were in the employment of defendant and in the ordinary discharge of the duties of their service for it, and that one of such coemployés (Gibson) did, without warning to plaintiff, handle the end or part of the car he was holding so as to cause or permit it to fall upon or be thrown against and to strike plaintiff's thigh, and that in so doing, if he did, he failed to exercise such care as an ordinarily prudent person would have exercised under the same or similar circumstances, and that such failure on his part, if he did so fail, was a proximate cause, as before defined, of alleged injuries to plaintiff, if any, then let the verdict be for the plaintiff, unless you find for defendant under some other instruction or instructions of the court." Thus we see that, in affirmatively presenting the plaintiff's theory of the case, the issue of negligence vel non was distinctly submitted and an affirmative finding required thereon before the jury's verdict could be in his favor.

Again the jury was instructed upon the defendant's theory of the case: "If, from the evidence, you believe that Gibson, while assisting in the moving of the car, stumbled in a way to cause the car to fall upon or be thrown against plaintiff's thigh, *but that such was done without any want of ordinary care on Gibson's part*, or you believe that

Gibson, in handling the car in question as you may find was done by him, would not reasonably have anticipated injury to plaintiff as alleged, or some like injury, as a natural and probable consequence, then plaintiff's alleged injuries, if any, would be deemed the result of a risk ordinarily incident to the service in which he· was employed, and an unavoidable accident, and, if you so find, let the verdict be for defendant." Thus we see again that the issue of negligence is again clearly submitted, with instructions to find in defendant's favor if the stumble was without negligence on Gibson's part.

As we have seen, the defendant's plea of assumed risk and the requested charge is merely an abstract statement of the law of assumed risk as applied to ordinary risks incident to the service. If defendant had pleaded, and the charge had affirmatively presented, the issue of assumed risk, based upon the theory that the stumble was accidental, then, under the authority of that line of cases of which Railway Co. v. McGlamory, 89 Tex. 638, 35 S. W. 1058, is the leading one, it would have perhaps been proper to have given the same. Even in such case I am not prepared to concede that its refusal would have been reversible error in view of the presentation of the issues' to the jury in the paragraphs of the charge above quoted. But I am firmly impressed with the idea that the refusal of the special charge in the form here requested was certainly not reversible error; that this is true under the prior rules and decisions of our courts (Railway Co. v. Zapp, 49 S. W. 673), and it is especially true in view of the recent rule (62a) adopted by the Supreme ·Court for the government of the Courts of Civil Appeals (149 S. W. x). Certainly the refusal of that charge was not reasonably calculated to cause and probably did not cause, the rendition of an improper judgment, and, at all events, under that rule its refusal should not be treated as reversible error.

The Brisco Case cited in the majority opinion has no bearing whatever upon the question under consideration, and the résumé of the case there made is incomplete, erroneous, and unintentionally misleading. In that case certain work had been usually and customarily performed in a *negligent* manner. Plaintiff was experienced in the work and knew or was charged with knowledge that the same was done in such negligent manner and participated therein. A special charge was requested by defendant as follows: "If you believe from the evidence that plaintiff was injured at the time and place and in the manner charged in the petition, and if you further believe that plaintiff's said injuries were caused by the rapid movement of the hand car from the toolhouse to the railway track at a point on the railway track where there was a switch and a guard

rail or rails, and if you further believe that it was negligence, as that term has been defined to you, in the section hands to move the said hand car from the toolhouse to the railway track at that place with the speed it was moved, and if you further believe from the evidence that at the time the plaintiff was injured he was an experienced section hand and knew, or might have known by the use of ordinary care, the risk and danger of moving the said hand car in the manner it was moved, and if you further believe that the said hand car at that time was moved by the section hands in the manner which theretofore had been usual and customary with them, and if you believe that plaintiff at the time knew the ordinary manner and custom of the section hands theretofore in moving the said hand car from the toolhouse to the railway track, then plaintiff assumed all risk to himself of injuries by reason of the manner of moving the said car at that place, and defendant is not liable to plaintiff for any injuries received by him, and you will find for the defendant." The members of the Court of Civil Appeals being divided as to whether or not, under the facts detailed, such a charge should have been given, and being in doubt as to the· correct application of the doctrine of assumed risk, certified two questions to the Supreme Court as follows:

"Question 1. In view of the evidence and the charge of the court, was the defendant entitled to the requested charge, and should it have been given?

"Question 2. Does an employé connected with a particular work assume the risk of dangers arising from the usual and customary negligent manner of the doing of such work by his coemployés, when he is experienced in such work and knows, or must necessarily have known, of the usual and customary manner of doing such work?"

The Supreme Court answered the questions as follows:

"The court erred in not giving the charge set out in the statement submitted. There was evidence from which the jury might have found that the hand car was uniformly placed upon the track by giving it a hard push to get it over the first rail of the track. This was the method of doing the work, and they might also have found that Brisco was daily engaged in assisting them put the car on the track as he was engaged on that occasion, and knew of the manner in which his fellow servants uniformly performed that work. The jury might have found that the car on this occasion was shoved as it usually was and with no more force. The evidence is conflicting upon these issues, but the jury might have concluded that Brisco assumed the risk of putting the car on the track in the manner in which it was done. Texas & P. Ry. Co. v. Bradford, 66 Tex. 732, 2 S. W. 595, 59 Am. Rep. 639; Lynch v. Boston & A. Ry. Co., 159 Mass. 536, 34 N. E. 1072; Hunt

v. Kile, 98 Fed. 49, 38 C. C. A. 641; Red River Line v. Cheatham, 60 Fed. 517, 9 C. C. A. 124; Gulf, C. & S. F. Ry. Co. v. Harriett, 80 Tex. 83, 15 S. W. 556.

"One who is engaged in the performance of work in a manner well known to him must be held to assume the risks of dangers which are involved in the performance of the work in that way. There was no conflict in the testimony as to the fact that Brisco had been engaged in performing this character of work (that is, putting the car upon the track for some time); that he was experienced and had full knowledge as to the method in which the work was done. He was participating in the work on this occasion, and the facts bring it within the rule laid down by this court in Gulf, C. & S. F. Ry. Co. v. Huyett, 99 Tex. 630, 92 S. W. 454, 5 L. R. A. (N. S.) 669.

"The difference between the case at bar and the case of Railway Co. v. Turner [99 Tex. 547] 91 S. W. 562, is that in the Turner Case the injured party was not engaged in the work of switching the cars from which the injury occurred to him, but was engaged in a wholly independent business. He was not in a position to know at the time that the cars were being switched, as usual, in an unsafe and negligent way. The question of the assumption of risk depends largely upon the position of the party who is to be charged with such assumption with regard to his opportunity for knowing that at that time the thing to be done will be performed in the usual manner. If, knowing the usual method of doing the work and that it will be performed in that way, he participates in it, he will be held to assume the risk."

It will thus be seen that there is no analogy whatever between this case and the Brisco Case, as no question is here presented of a customary and usual negligent manner of handling the car which injured plaintiff, of which he knew, in which he participated, and to which his injury was attributable. There is no plea, no evidence, and no issue to submit to the jury that Gibson's stumble, if negligent (as the jury found it to be), was a customary and usual method of doing the work.

Believing that the reversal herein is based upon an action of the trial court which, if it be conceded to be erroneous, was an error which deprived the defendant of no substantial right whatever, and that the general charge of the court amply protected it in any possible defense which it might have had under the law of assumed risk, I am therefore constrained to enter my dissent.

On Rehearing.

HIGGINS, J. [3] Upon consideration of motion for rehearing herein, Chief Justice HARPER concludes that the refusal of the requested special charge upon assumed risk does not present reversible error, and that the motion should be granted and the cause affirmed. It will therefore be so ordered. It then becomes necessary to dispose of the fourth and fifth assignments of error, which were not passed upon in the original majority opinion. In passing upon the same, it becomes necessary to make a more complete statement of the nature of the case and facts adduced in evidence than was contained in the original opinion of the majority.

Appellee was employed as a laborer by appellant, and while engaged in his work, together with other employés, in the yards of appellant in the city of Houston, he received injuries while moving a push car from one track to another. It is alleged: That one of his coemployés, Gibson, who was handling one end of the car, negligently caused the same or permitted it to fall upon or be thrown against plaintiff's leg and strike the thigh thereof a few inches above the knee with great force and violence, whereby the leg, thigh, and hip and the muscles and nerves thereof and cognate muscles and nerves were so impaired that as a natural and proximate result thereof he had sustained injuries as hereinafter stated. That the injuries complained of were not instantaneously or immediately developed by the blow on the thigh, but were progressively developed so that he did not at first suppose he was seriously or permanently injured, although the pain was great, and so supposing he went back to work. That he continued to feel some suffering, deadness, or unnaturalness in his said leg, and about two weeks after the said blow on his thigh plaintiff undertook, in the usual course of his work, to move certain heavy timbers of a size and kind such as he had frequently handled without hurt, and which as a prudent man he might properly handle as he was then attempting to do, but his leg, on account of the aforesaid blow on the thigh from said push car, gave away or down so that he was unable to continue such work of moving such timbers and had to desist therefrom. That said injury continued to progress seriously to a condition of permanency, so that about a month after the casualty, when he was at or near defendant's office for the purpose of obtaining his pay, he, without negligence on his part, slipped on his uninjured leg and thereby threw his entire weight upon his right leg, which had received the blow from the push car, as aforesaid, whereupon, on account of such blow on said thigh, the injured leg gave way or down and caused him to sustain a violent fall, with his injured leg twisted or doubled up under him, from which condition he was unable to extricate himself, and, being utterly helpless, was taken thence to his home and from there to the hospital, from which, after treatment by appellant's surgeon, he had been discharged a hopeless and permanent cripple. That as a natural and proximate result of said blow from said car, by defendant's negligence, the muscles and nerves, cords and tendons of his thigh and hip, in-

cluding the cognate muscles and nerves pertaining to same, became weakened, atrophied, and impaired, whereby and on account whereof his leg and thigh gave way, as aforesaid, causing him to fall, as aforesaid, on the occasion aforesaid, producing, according to his information and belief, an ununited fracture of the femur or thigh bone, and an improper union or connection between the head of the bone and the joint cavity (the acetabulum), so that the thigh bone rests in or is connected with the pelvis in an abnormal position, causing a shortening of the limb, producing pain in same, and interfering with the motion thereof, and said hip joint so dislocated and the hip impaired, and the bone pertaining to same fractured or so injured that he has permanently lost the use of the leg, thigh, and hip, rendering him a permanent cripple. That his injuries were directly caused and developed by said blow and consequent impairment of the muscles and nerves, as aforesaid, or, if not, by the giving way or down of his leg when he attempted to lift the timbers or when he slipped and fell; and, in either event, they were in a natural and probable sequence and natural and proximate result of the said blow from the car. The other allegations usual in such cases were made.

The evidence discloses that appellee was first hurt about September 15, 1907, while he and three other men were engaged in lifting a push car from one track onto another track. While so moving the car one Gibson, who was assisting in so doing, turned loose the end of the car he was holding, whereby the car was jerked over against appellee, and the end of the car which he was lifting dropped down and struck him on the right leg two or three inches above his knee. Gibson was caused to turn loose his end of the car by a stumble. The blow upon his leg caused appellee some pain, and during the remainder of the day it had a dead or numb feeling and a big black spot upon the same. He did not think he was seriously hurt, and continued his work during the remainder of that day and for about two weeks more. During this time the leg continued to feel numb and dead and sore, with a tingling sensation and more or less pain. After continuing his work for about two weeks, he was engaged in unloading some timber from a grading car of no greater weight than the ones usually handled by him in doing such work, and, while engaged in so unloading such timbers, he picked up the end of one and a coservant, Dooley, picked up the other end, when plaintiff's leg, which had received the blow aforesaid, gave way, with considerable pain from the knee up to and including the hip, and he became unable to stand on that leg or to continue his work in unloading the timbers. He then began stacking lumber, which he was able to do until about half past 4 o'clock in the afternoon, when he was unable to continue longer at that work, and he then sorted nails until quitting time at 6 o'clock. When he quit at 6 he walked with difficulty and with pain and was carried home and remained at home for the next 10 days, during which time he was confined in the house most of the time, suffering considerable pain. On pay day he went to receive his pay, and after receiving the same, while walking across the room, he slipped on his uninjured leg and he threw his weight upon and caught on the injured leg, which gave way and he fell. After this fall he was unable to arise or to walk and was carried home, and thence the same day to the company's hospital, where he remained for some time, and upon leaving the same had to do so upon crutches and has since been a cripple.

[4] The fourth assignment complains of the following paragraph of the court's charge: "If your verdict is in favor of the plaintiff, you will assess his damages at such sum as you believe, from the evidence, will fairly and adequately compensate him for alleged injuries, if any, which you may find from the evidence he has sustained as a natural and proximate result of his thigh being struck by the car in question, if it was, taking into consideration, as elements of damage, so far as shown by the evidence (if at all) to be the natural and probable result of such injuries: (1) Mental anguish and physical suffering, if any, including such as he will in reasonable probability suffer in the future, if any; (2) the reasonable value of his lost time down to the trial, if any; and (3) the reasonable value, if paid now, of his lost earning power in the future beyond the trial, if any."

The proposition subjoined to this assignment reads: "The petition was insufficient to authorize a recovery for mental anguish which might be suffered by plaintiff in the future, or for lost time down to the very time of the trial or for loss of earning power in the future, because it affirmatively appeared that the only injury for which, under the facts of the case, there could be liability was a trivial injury, and because any injury sustained by plaintiff as a result of his second and third accidents was not in law the direct and proximate result of the first accident; it affirmatively appearing from the evidence that the first accident was trivial, and the petition alleging no serious or permanent injury as a result of anything except the second and third accidents." This proposition is somewhat obscure, and, as we understand it, the contention is that neither the petition nor the facts of the case authorized a recovery for mental anguish which might be suffered by appellee in the future, or for previous lost time, or for impaired future earning capacity, because it affirmatively appears that the only injury for which appellant was liable was the blow upon the leg by the push car, which was trivial in its nature, and that the injuries from which he suffered were not caused by the blow up-

on the leg, but were the result of the second and third accidents, and therefore the injuries were not the direct and proximate result of the negligent blow upon the leg by the car.

The fifth assignment, submitted as a proposition, reads: "The court erred in overruling defendant's motion for a new trial, for the reason that the verdict of the jury is grossly excessive, and reflects that sympathy controlled the minds of the jury in fixing the amount of their verdict, and that the jury plainly took into consideration plaintiff's present physical condition, and did not properly consider what caused his present condition." This assignment raises the same question as to the proximate cause of the injury as was raised by the fourth assignment. The material allegations of the petition are quoted above, and the same is not subject to the objection urged, since it was averred that the injuries were directly caused and developed by the blow upon the leg from the car and consequent impairment of the muscles and nerves, or, if not, by the giving away of the leg when appellee was lifting the heavy timbers, or when he slipped and fell at the pay office, and that, in either event, they were the proximate result, in a natural and probable sequence, of the blow from the car.

[5] We pass now to a consideration of the facts. It appears appellee is suffering from a dislocation of the right hip joint; the head of the femur bone having slipped out of its natural socket and was pressing upward against the pelvic bone, where it had formed a false joint. Upon the former appeal it was held by the San Antonio Court of Civil Appeals that this condition was due to the fall at the pay station, and that such fall was caused by a greasy floor. It was further held that, such fall being intervening and entirely independent of the blow upon the leg by the car, a recovery could not be had for the injuries resulting from the same, unless the fall and its injurious consequences could have reasonably been anticipated as a result of the original act of negligence. The legal principles recognized by the San Antonio court are well settled and undisputed, but the record upon this appeal presents an entirely different state of facts. Appellant in its brief admits the evidence here differs from that upon the former appeal. Drs. Red, Stewart, and Knox, surgeons for appellant, examined plaintiff in October, 1907, at appellant's hospital, shortly after the fall at the pay office, and did not discover any dislocation or fracture of the hip. That a dislocation of the hip subsequently developed is not a controverted issue in the case. Dr. Red testified that in June, 1908, upon the occasion of the first trial, he and Dr. Knox examined appellee and found the entire right leg shortened and smaller than the left, and also found an upward dislocation of the hip. Dr. Red testified that he then found the

right hip joint had formed a false joint and the head of the femur was pressing up against the pelvic bone. He further testified that, if a man received a heavy blow on the leg above the knee, injury to the nerves might result, which nerve injury might produce atrophy; that such atrophy was usually a slow process, so slow that at first the extent of the injury is not appreciated; it does not develop at first, but in the course of a few weeks would begin to be manifest. If the ligaments which hold the head of the femur or hip bone in place, because of want of supply from their connecting nerves or from inflammation, become atrophied or incapable of holding the hip joint in place, such hip joint might slip out and find lodgment in the pelvic region, where it would form a new juncture. In response to a hypothetical question propounded by appellant's counsel, he stated that the blow upon appellee's leg from the push car was not likely, alone and unaided, to produce the dislocated hip from which appellee was suffering, but admitted it might do so. From the testimony of Dr. J. G. Boyd, witness for appellee, it appears that the blow of the push car on appellee's leg may have caused an injury to the nerves, muscles, and ligaments, producing an atrophied or abnormal condition, which finally resulted in the dislocation of the hip and formation of a new joint, as it appeared was the condition of appellee, and that such dislocation and condition may have resulted entirely independent of and unaided by the giving away of the leg while unloading the timbers and the fall at the pay station. His attention being called to the fact that an examination of appellee at the hospital made by appellant's surgeons, Red, Knox, and Stewart, after the fall at the pay station, failing to disclose any such hip dislocation, he then testified that he would say the dislocation resulted from an inflammatory condition of the joint, and that he would attribute the inflammatory condition, under the history of the case as stated to him hypothetically, to the injury on the leg. Dr. Boyd also testified substantially the same as Dr. Red to the usual apparent triviality of injuries to the nerves and resulting atrophy in its incipiency, and that the manifestations of the injury were slow and progressive in character; the true seriousness and ultimate effect of the injury becoming apparent at a later date.

As upon the first trial the cause was submitted to the jury on the theory that the blow on the leg was the proximate cause of the injuries by appellee, and in that connection the jury was instructed: "If you believe from the evidence that plaintiff was caused a dislocation of the hip or other injuries by slipping on a greasy floor when he went to get his pay, then you will allow nothing therefor. You will consider the injuries, if any, to plaintiff from lifting the timber or planks in question only for the

purpose of determining the progression and development, if such there was, of alleged injuries to the muscles, nerves, and tendons, if any, which you may from the evidence find to be the natural and proximate result of the blow or stroke from the car, if any." It therefore follows that the jury found that plaintiff's injuries were not due to the fall at the pay office. That they were warranted in this finding is apparent from the fact that the examination by the surgeons, Red, Stewart, and Knox, after the fall, failed to disclose any such dislocation, and the finding that it was due to the original blow upon the leg is entirely consistent and in harmony with the testimony of Red and Boyd relating to injuries to nerves produced by a blow, and, where the injury was to nerves and muscles of the leg, may eventually result in a dislocation of the hip joint.

We thus see that upon the former appeal the San Antonio court held the evidence disclosed plaintiff's injuries to be the result of the fall at the pay office, which was an independent, intervening cause and disconnected agency from the original accident, and that such fall and its injurious consequences could not have been reasonably anticipated as a result of the original act of negligence. Upon the trial from which this appeal is prosecuted, the jury has made a contrary finding of fact, and, as we have seen, such finding is supported by the evidence. Appellee's condition was undoubtedly due either to the blow upon the leg or to the fall which he sustained at the pay office, and there is nothing in the evidence to suggest that the giving way of his leg while handling the timbers caused the same. The court, therefore, properly limited the jury in its consideration of this latter phase of the case, as indicated by the last paragraph of the portion of the charge above quoted.

[6] What has been said disposes of the contention under the fifth assignment that the verdict of the jury is excessive. It cannot be, and is not contended, that $7,000, the amount of the judgment, is an excessive verdict if appellee's condition is the direct and proximate result of the blow from the push car. The contention is that his disabled condition is due to the second and third accidents for which appellant is not liable, and, for the reasons stated above, this contention is regarded as untenable.

Associate Justice McKENZIE does not concur in the views expressed herein and will later file his dissent.

The motion for rehearing is granted, and the judgment of the lower court affirmed.

McKENZIE, J. (dissenting). I am of the opinion that the pleadings and the evidence required of the trial court the submission of the issue of assumed risk. That the servant assumes the risks ordinarily incident to his employment is elementary law. "What particular risks of the service are ordinary (that is, incident to, or usual in, the service) is ordinarily a queston for the jury; its determination not being assumed by the court, except when, as in case of any other matter of fact, reasonable minds cannot differ." Street on Personal Injuries in Texas, p. 265. That the issue of assumed risk is a question for the determination of the jury is also decided in Bonnett v. Railway Co., 89 Tex. 72, 33 S. W. 334. It is also the law that the defense of assumed risk should be affirmatively presented by proper charge to the jury and not confused by other issues.

I am also of the opinion that appellant's fourth and fifth assignments of error should be sustained. The testimony shows that appellee was injured on three separate occasions. By the charge of the court the right of recovery on account of the second and third injuries was eliminated, but the court permitted the jury to consider the second injury only for the purpose of determining the progression and development of the alleged injury to the muscles, nerves, and tendons caused by the stroke of the car upon appellee's leg. This limitation upon appellee's right of recovery is not complained of, and was justified by the pleadings when considered in the light of the opinion as rendered by the Court of Civil Apeals in the former appeal of this cause. Considering the evidence, therefore, in the light of the pleadings and of the court's charge, I am convinced that the evidence shows affirmatively that the injury from the first accident was trivial and not of itself permanent. The verdict, too, reflects that sympathy as well as the plaintiff's physical condition at the time of the trial controlled the jury in fixing the amount of damages.

Plaintiff's testimony in part is as follows: "The end of the car * · * * struck me on the leg, the right leg, about two or three inches above my knee; when it struck me, there was pain with it, and I did complain of its hurting me; I told the boys about it; I told Gibson he had jerked the car on my leg; I accused him of jerking the car on my leg; I told them, all the boys that were there, and all the rest of them that would ask me; I would tell them about it you know; I didn't think I was seriously hurt, not at that time I did not; I did examine the place where the car struck me; that evening, after I quit work, I examined it, and during the day it had felt kind of a pain and dead feeling, kind of a numb feeling, and when I examined it I found kind of a big black spot there; I did continue my work that day; I worked on for about two weeks more, and my leg was hurting me all the time a right smart; it was hurting me, and it felt a numbness or deadness; it felt a dead feeling, hurt, and dead feeling, and the muscles felt sore, and I did suffer a tingling feeling in it; that kept on for about two weeks, kept up for about two weeks, and there was something happened at the end of

this two weeks that indicated the condition of my leg; I worked on for about two weeks, maybe something over two weeks, and then I was unloading some 2 by 12's from a grading car; that was in the ordinary course of my work; we done a good deal of that work all the time around the shop; the laboring men like me had that sort of lifting to do; they were not any heavier than the usual ones; I was lifting them in the manner that was usual in the work; while I was lifting them, something happened to my leg; I had been working there on the car some considerable little time and I picked up the end of one, and Mr. Dooley picked up the other end of it, and I went to put my leg over some more there to keep from stumbling around and my leg went down on me; at that time my leg gave down, it just went down, and lots of pain, and that pain was distributed all through the leg, all the way from the knee up to the hip; it did include the hip; I was not able to stand on that leg then when it gave down on me; I wasn't able to work up there any more, and this man told me I had better get down and stack up the lumber they were throwing off from the skid; somebody told me I had better get down and stack up lumber, and I did try to do that, and I succeeded in doing it, and kept on with the work until about half past four I guess, and I told the man I couldn't stand the work any longer; I would have to lay off that evening, so I went over then to where my other clothes were, to put on the other clothes, and I went from there then over to the cooler to get me a drink, and there I saw Mr. Olsen, and I told him about it; I think Mr. Olsen is superintendent around there; he was my boss, boss over me, at that time he was, and he told me I wouldn't have to lay off; I could sort out nails, and he put me in the nail room and he said he had been wanting somebody for that job for a good while; so, instead of stacking the lumber, I assorted nails, and I continued that work during the rest of the evening; I was sitting down while I was doing the work of assorting the nails; knocking off time came about 15 minutes until 6, and when I started to leave there I could not walk, considerable trouble; I had a stick though; some of the boys gave me a stick; one of the boys gave me a stick, and there was pain and suffering in my movements, a good deal; there was a good deal of that, and I would hurt as I would walk; I lived some eight or nine blocks I guess from there; my brother-in-law carried me home; I sent one of the boys after him, and he sent his little boy; I sent for him because I was not able to get home without assistance and after I went home, for the next 10 days or so, I stayed at home; as to the condition of that leg during the time as to pain in it and feeling in it, there was lots of pain in it; I had lots of pain, and dead, the muscles, hurt the muscles, and it had a tingling feeling in it; I have had the tooth ache and nerve trouble; it was something like that; I was indoors most of that time; well, for some 10 or 15 days this pain was mighty bad, and after that time I went to the shop then that coming pay day to get my money; I think it was the August pay day as well as I remember; * * * the car struck me right there, in the front part, and about two or three inches above the knee I would say, in the front part and about two or three inches above the knee on my right leg; the under side of the car struck me there. * * * At the time I lifted that heavy timber, I said it was 2 by 12 and it was cypress timber; the length of the stick, some was 24 feet long as near as I remember, and some 12, different lengths, from 12 to 24 feet in length, and I was lifting one end and my assistant was lifting the other end; when I was lifting, at the time when my leg gave way, as well as I can remember, I think we had a long one, but of course I wouldn't be sure about it; I wouldn't be positive; it was somewhere near to 12 o'clock in the day when my leg gave way; I had been lifting all morning that same kind of timber, and it was close to 12 o'clock; I had lifted a good many that morning; * * * I just went down like that, come down with this leg, this right leg, just one leg; when I went down that way the lumber fell off to one side, * * * and I was lifting there and my right leg gave down and I dropped the stick of lumber; * * * I had raised it that way and tried to skid it over, and this leg gave down; * * * during that two weeks between the time Gibson dropped the car and I lifted that heavy timber, I did any kind of work, whether heavy or light, that came within the line of my duty as an employé there, and I was doing it that way, and when I discovered the weakness of that limb I quit and the foreman put me at something I could sit down at; I did not continue to work from that time on, as well as I can remember, some 10 or 15, maybe 20, days; I don't remember exactly how many days before this pay day I was telling you about; I mean I did not work for 10 or 15 days before pay day; the foreman put me to assorting nails that afternoon, and the next day I did not work at all, and didn't work any more until the pay day, and on the pay day I drew pay for the whole month; when I went to the office wherever it was to collect my pay, I did not walk there; I never walked, only from my brother-in-law's place of business where he was running a furniture store on Conti by the Harral Mill, just across the street there, and I walked I suppose a half block, maybe a block; I had been walking all the time every day during that time; I did walk and I went over there and got my check, and they paid me for the whole time; * * * I was paid about 11 o'clock in the morning, and

about 5 o'clock that afternoon I was carried to the hospital as well as I remember; we had to go up a little flight of stairs to get to the place where they paid us off, to the second story; it was a tolerable tall story; it was a tolerable narrow steep ascent, narrow stairway with a high tread, a high tread, tolerably so, but I think there was railings on the outside; I think there was; I don't know for sure, but I think so; I walked up that staircase by myself without assistance, and I walked down that staircase by myself and without assistance, and I had to be carried home; I was carried home, but if you understand though, after I came down, got my check, I was walking across the floor by the machine and there was some sawdust and grit on the floor, and as I walked along there my foot slipped that way, and I tried to catch on this one and I went down; I walked up there and walked down, and after I came down I slipped on my left foot and caught on my right foot and fell down and hurt myself, and from that time on I couldn't walk and I went to the hospital that evening; I slipped on the floor; I fell; and the injury I received there is what made me so I couldn't walk, when I had walked upstairs and downstairs just before; that is right. Immediately before I could walk upstairs and walk downstairs, and I slipped on the floor and fell and then couldn't walk; after I fell, the fall of course was what it was that made me so I could not walk; that fall did hurt me; it continued to hurt me from that time on until I am relieved to the extent that I am relieved; it hurt me in the knee here and runs from the knee up to the hip and back; the way I fell, this foot slipped, my left foot slipped, and I went to catch on this one, and of course being weak it went down on me; my left foot slipped and I went to catch on my right foot and I fell; I slipped with my left foot; I caught with my right foot and fell; that's right; I just fell right down; my right leg was doubled up under me; after having fallen on my right leg with my body on it, I could not get up with my own strength; a man by the name of Mike O'Donnell picked me up, and that is the reason I had to be carried home and carried to the hospital; * * * I got my money and fell there on the floor; there was a month between the time the car struck me and the time I fell on the floor, about that time; the car struck me in September; it was a month later; * * * the 16th of October I got my pay and got hurt falling on the floor; * * * I stated that when I was lifting these timbers and my leg gave way on me that I continued to skid some more down of the same kind after that; I said I skidded a few, and the reason I stopped was because my leg was so bad I couldn't, hurting me so bad; * * * I told counsel I slipped on a sandy, greasy floor, slipped on the left foot (that is, my good leg), and I

tried to catch myself, but whether I come flat footed on the right leg, it was so quick I couldn't hardly remember; when I got down there, the first thing I had was kind of a faint feeling, and there was pain in my leg from the knee up; the way that compared with the pain I had suffered when I was lifting the timbers about 12 days ago, somewhere like that, it was like it; I did not feel any more indication at that time of a dislocation of the hip than I did when I lifted the timbers; if there was any, I didn't feel it. * * * Counsel just put the question to me and I said this, in substance: That, when I fell on that floor and got hurt, I felt just about like I did when I undertook to lift that timber, and I give down under it; I meant that; after I fell on that floor, I could not have gotten up there and handled two, or three, or four, or five big 2 by 12 timbers and lifted them and skidded them down; I don't think I could, and the reason is the pain— Q. Why couldn't you if you felt like you did when you gave way with the timber? A. The pain was just the same; I could not have gotten up there and lifted those timbers; I don't think I could; I couldn't have done that; after I gave down there, lifting that heavy timber, I walked about with the aid of a stick about two weeks and climbed that flight of stairs and came down, but, as to why I didn't do that after I fell there on the floor, I wasn't able to; I couldn't do it; after I fell there on the floor, the pain was about the same; it was about the same feeling you know of pain; I mean the recognition of the fact there was a pain, by my mental organism, was about the same in one instance as the other; that is what I mean (that is, both hurt), and that is all I mean, both of them hurt; * * * I said my leg, when I was at the pay station, gave way in the same manner as it done before, and my pain was the same sort of pain, but it gave down worse then than it did before."

The testimony fails to show any injury to plaintiff's hip by the first accident. It was not until the second accident that injury to the hip is complained of, nor can it be said that any progression of injury has been shown between the time of the first and second accidents; the proof to the contrary would indicate that up to the time plaintiff received the second injury from his lifting the heavy timbers he did not suffer any ill effects to the hip; nor does the proof show that the first injury caused his leg to become smaller or atrophied, or that it in any manner affected the hip. It seems clear from plaintiff's testimony that the serious results were brought about by the second and third accidents. The second accident was of such severity as to cause him to quit work. The third accident was such as made him helpless and necessitated his going to the hospital. In the light of the testimony, it would

seem that the second and the third accident brought about the condition as to atrophy and the shrinking of the muscles and tendons, etc., which caused the dislocation of the hip. The testimony of Dr. Boyd is to the effect that atrophy would not show in the leg in the two weeks intervening between the happening of the first and second accident; and, from the testimony of the doctors, one is convinced that the lick as actually received on the leg did not cause the harmful results. Dr. Boyd's testimony, when read as a whole, is strongly to the effect that the plaintiff's condition at the time of the trial must have been brought about by the second or third injury, or both combined. Dr. Boyd was plaintiff's most favorable witness. A careful study of all the evidence convinces me that it is susceptible of but one conclusion, and that is that the lick on the front part of the leg, two or three inches above the knee, of itself did not cause the dislocation of the hip, nor did it cause the atrophy which did dislocate it; and, unaided by the second and third accidents or injuries, dislocation of the hip would not have occurred from the first. The testimony of the doctors appears to be more or less speculative, and the conclusions evolved by them do not seem to be based upon conditions identical with or similar to the conditions as testified to by the plaintiff; that is, an injury such as is actually shown to have occurred to plaintiff by the first accident.

I am therefore of the opinion that this cause should be either reversed and remanded, or that a proper remittitur be ordered, allowing plaintiff judgment for a nominal sum.